Rabbi Yitzchok LeBLANC–STERNBERG, Chanie Leblanc–Sternberg, Fred Walfish, Lewis Kamman, Park Avenue Synagogue, Inc., Plaintiffs–Appellants–Cross–Appellees,

v.

Robert FLETCHER, Marianne Cucolo, John C. Layne, and Nicholas Vertullo, Individually and in their capacity as Trustees of the Village of Airmont, Maureen Kendrick, Individually and in her capacity as Mayor of the Village of Airmont, Raymond Kane, Paul Berliner, The Airmont Civic Association, The Village of Airmont, The Town of Ramapo, and Herbert Reisman, Individually and in his capacity as Ramapo Town Supervisor, Defendants,

Robert Fletcher, John C. Layne, Nicholas Vertullo, Maureen Kendrick, and Raymond Kane, Individually, and in their capacity as Trustees of the Village of Airmont, and The Village of Airmont, Defendants–Appellees,

Robert Fletcher and Nicholas Vertullo, Defendants–Appellees–Cross–Appellants.

UNITED STATES of America, Plaintiff–Appellant,

v.

The VILLAGE OF AIRMONT, Airmont Civic Association, Ralph Bracco, in his capacity as Mayor of the Village of Airmont, John C. Layne, Raymond Kane, Charles Calotta and Ronald Sabo, in their capacities as trustees of the Village of Airmont, Defendants–Appellees.

Nos. 779, 780 and 1018, Docket 94–7103, 94–6048 and 94–6125.

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1995.

Decided Sept. 21, 1995.

Craig L. Parshall, Fredericksburg, Virginia (Renee Wright, The Rutherford Institute, Charlottesville, Virginia, Reuben Koolyk, Randy Shaheen, Arnold & Porter, New York City, on the brief), for plaintiffs-appellants-cross-appellees Rabbi Yitzchok LeBlanc-Sternberg, Chanie LeBlanc-Sternberg, Fred Walfish, Lewis Kamman, Park Avenue Synagogue, Inc.

Sara L. Shudofsky, Assistant United States Attorney, New York City, (Mary Jo White, United States Attorney for the Southern District of New York, James L. Cott, Steven M. Haber, Assistant United States Attorneys, New York City, on the brief), for plaintiff-appellant United States of America.

Dennis E.A. Lynch, Nyack, New York (Dorfman, Lynch & Knoebel, Nyack, New York, on the brief), for defendants-appellees Village of Airmont, Raymond Kane, Maureen Kendrick, and John C. Layne.

Edmund C. Grainger, III, White Plains, New York (McCullough, Goldberger & Staudt, White Plains, New York, on the brief), for defendants-appellees-cross-appellants Robert Fletcher & Nicholas Vertullo.

G. Oliver Koppell, Attorney General of the State of New York, New York City (Sanford M. Cohen, Assistant Attorney General, New York, New York, of counsel), filed a brief for Amicus Curiae the State of New York in support of Appellants.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Howard W. Goldstein, Stephen E. Raynes, New York City, Steven M. Freeman, The Anti–Defamation League of B'nai B'rith, New York City, of counsel), filed a brief for amicus curiae Anti–Defamation League of B'nai B'rith in support of Appellants.

David Zwiebel, Morton M. Avigdor, New York City, filed a brief for Amicus Curiae Agudath Israel of America in support of Appellants.

Barbara J. Samel, Albany, New York, filed a brief for Amicus Curiae The New York State Conference of Mayors & Municipal Officials in support of Appellees.

Before: KEARSE, McLAUGHLIN and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

These appeals from judgments entered in actions consolidated for trial in the United States District Court for the Southern District of New York, Gerard L. Goettel, *Judge,* involve claims that defendant Village of Airmont, New York ("Airmont" or the "Village"), along with individual defendants who incorporated the Village and/or served as its officers, discriminated against Orthodox Jews on the basis of their religion through the adoption of zoning policies limiting the use of Orthodox rabbis' homes for prayer services. In the action brought by the United States, the district court, as trier of fact, dismissed the government's claims under Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act," "FHA," or "the Act"), 42 U.S.C. § 3601 *et seq.* (1988), finding that the government did not establish that the Village or its officers had engaged in unlawful discrimina-

tion or that its zoning code would be interpreted in a discriminatory manner. In the other action, brought against the Village and its officers by plaintiffs Rabbi Yitzchok Le-Blanc–Sternberg, Park Avenue Synagogue, Inc., and three members of that congregation under 42 U.S.C. § 1983 (1988), claiming violations of, *inter alia,* the Fair Housing Act, the First Amendment, and 42 U.S.C. § 1985(3) (1988), a jury, while finding in favor of the individual defendants, had found that the Village had violated the private plaintiffs' rights under the Fair Housing Act and conspired to violate their First Amendment rights. Thereafter, the district court, incorporating the facts and reasoning set out in its own decision dismissing the government's action, denied the private plaintiffs' claims for injunctive relief, set aside the jury's verdict in favor of the private plaintiffs against the Village, and entered judgment pursuant to Fed.R.Civ.P. 50(b) dismissing their complaint as a matter of law.

On appeal, the government contends principally that the district court failed to apply Fair Housing Act principles and that it abused its discretion in refusing to enjoin the Village from engaging in conduct that would violate the Act. The private plaintiffs contend principally (a) that the court improperly entered judgment against them as a matter of law on their First Amendment and FHA claims against the Village in light of the jury's verdict in their favor on those claims, and (b) that because of errors in the court's instructions and evidentiary rulings, they are entitled to a new trial on their claims against the individual defendants. Robert Fletcher and Nicholas Vertullo, who were among the defendants in the private suit who received a jury verdict in their favor, cross-appeal, arguing principally that they should have been granted judgment as a matter of law at the close of the private plaintiffs' case.

For the reasons that follow, we reverse so much of the judgment entered in the private action, appealed in Nos. 94–7103 and –6125, as dismissed the private plaintiffs' claims against the Village, we affirm so much of that judgment as dismissed the private plaintiffs' claims against the individual defendants, and we dismiss the cross-appeal as moot. As to

the judgment dismissing the government's action, appealed in No. 94–6048, we reverse. In both cases, we remand for further proceedings on issues as to relief.

## I. BACKGROUND

Airmont is located within the Town of Ramapo, New York ("Ramapo" or the "Town"), a large area that comprises a number of incorporated villages and unincorporated sections. During the 1980s, the Town's Orthodox Jewish population, including Hasidic Jews, a subgroup of Orthodox Jewry, grew substantially. This growth was accommodated by the Town's adoption and interpretation of certain zoning ordinances that facilitated adherence to certain restrictive principles of Orthodox Judaism. Airmont was incorporated in a movement critical of the zoning measures adopted by the Town. The evidence at trial, viewed in the light most favorable to the private plaintiffs as the parties challenging the entry of judgment against them as a matter of law, *see, e.g., Binder v. Long Island Lighting Co.,* 57 F.3d 193, 198–99 (2d Cir.1995), included the following.

### A. *Ramapo Allows Home Synagogues; Airmont is Incorporated*

Strict observance of Orthodox Judaism necessitates a relatively high number of local houses of worship. Daily prayer is required, and the saying of certain prayers and the reading from the Torah on the Sabbath require the presence of a "minyan"—a quorum of ten males over the age of 13. Orthodox Jews are forbidden to use cars or other means of transportation during religious holidays and the weekly Sabbath; thus, adherents are required to walk to their houses of worship. The combination of these requirements makes it important for Orthodox Jews to be able to gather for worship in congregations large enough to ensure the presence of a minyan, and close enough to the congregants' homes to allow them to walk to services.

Ramapo has a zoning code ("Ramapo Code") that, in most residential areas, allows a place of worship to be built only on a lot that is at least two acres in size. Construction of a synagogue on such a lot would cost

as much as $750,000, an expenditure that would require the support of approximately 150 families, far beyond the number of Orthodox Jewish families living near each other in Airmont. However, the Ramapo Code also includes a provision for "home professional offices" ("HPO"), which permits members of the "learned professions," including clergy, to operate offices within their homes, subject to certain restrictions. It provides that HPO use

> shall be incidental and secondary to the use of the residence for dwelling purpose, shall not change the character thereof and shall not have any evidence of such accessory use other than a permitted announcement sign. Said activity shall not occupy more than one-half (½) of the ground floor area of the residence or its equivalent elsewhere in the residence if so used. In said activity, no more than two (2) persons, including members of the family residing on the premises, shall be employed. Permissible "home professional office" uses include, but are not limited to, the following: clergymen, lawyers, physicians, dentists, architects, engineers or accountants.

Ramapo Code § 376–181, at 37678.

In recognition of the needs of Orthodox Jews for local houses of worship, the Town in the mid–1980s adopted an interpretation of its Code's HPO provision that permitted "home synagogues," by allowing rabbis to conduct worship services within their homes for groups not exceeding 49 individuals.

Until 1991, Airmont was an unincorporated area of Ramapo, governed by the Town's zoning decisions. In the mid–1980s, an organization called the Airmont Civic Association, Inc. ("ACA"), began to push for Airmont's incorporation. ACA was troubled by Ramapo's practice of allowing home synagogues under the HPO provision; it was also concerned about the purchase of a tract in an area of Airmont by a Hasidic group, and about proposed zoning for multiple-family housing in the Monsey section of Ramapo, which would facilitate the growth of the largely Hasidic population there.

ACA's principal goal was to gain control of zoning of the Airmont area. For example, a 1986 flyer invited residents to attend an ACA meeting, asking "WHY DO WE NEED TO INCORPORATE?" and listing "Zoning control and enforcement" among the reasons. Another 1986 ACA flyer focusing on the proposed Monsey zoning for multiple-family housing stated that "the Airmont Civic Association [was] concerned about zoning changes in our neighborhood," quoting a local newspaper article describing the proposal

> "that the town provide the Monsey area with some form of multi-family zoning to accommodate a large Hasidic community. For cultural and religious purposes, Hasidim need to live in close proximity to one another."

The flyer stated, "We need control over zoning . . . ."

Throughout the period prior to Airmont's incorporation, ACA emphasized the need for control over zoning in connection with the desire to keep Orthodox and Hasidic Jews out of the Airmont community. For example, ACA leaders polled Airmont residents as to their views, and one response, read aloud by ACA leaders at an August 1986 ACA meeting, stated as follows:

> [W]hat would be better, for us to loose [sic] our homes for a religious sect or for us to live as we have lived for the past 25 years . . . .
>
> . . . .
>
> . . . . [L]et the people in the unincorporated Area of Ramapo, go ahead and fight for what they believe in. Instead of giving up for what we've worked very hard for, to a bunch of people who insist on living in the past. I am not prejudice [sic] in any way, shape or form but i [sic] *will not* have a hasidic community in my backyard.

(Emphasis in original.) The minutes of the same meeting forecast "a grim picture of a Hasidic belt from Rockland through Orange & Sullivan counties." At a September 1986 meeting shortly after a Hasidic developer had bought land in the Airmont area, one of those attending referred to that purchase and stated that "everybody knows . . . why the Airmont Civic Association was formed. What does the Airmont Civic Association and the proposed village plan to do to keep these Hasidum [sic] out?" (Trial Transcript

("Tr.") at 2989.) The developer testified that in 1987, ACA's original president, James Filenbaum, stated that "the reason of forming this village is to keep people like you out of this neighborhood." (Tr. at 890.) At an ACA meeting in the spring of 1989, shortly after the Airmont area residents had voted for incorporation, the suggestion of one resident that ACA get involved in planting trees was met with

> a lot of grunts and groans from the audience and everything, and I heard Mr. Fletcher sitting in the back of the room respond to that by saying, you know, let's face it, the only reason we formed this village is to keep those Jews from Williamsburg [a Hasidic community in Brooklyn, New York] out of here.

(Tr. at 4031.) And a 1990 meeting notice proclaimed

> Only YOU can save your neighborhood! Please attend this important public hearing
>
> . . . .
>
> .... We urge you to express your views on the proposed complete restructuring of the town's zoning code to allow establishment of houses of worship by right in **ANY** home in **ANY** neighborhood.
>
> .... We cannot allow this disastrous abuse of our Master Plan.

(Emphasis in original.)

The referendum on incorporation of Airmont was held in early 1989. Though apparently most Orthodox Jews voted against incorporation, and a number of non-Orthodox residents opposed on tax-burden grounds, the vote was in favor of incorporation by a 3–1 margin. After delays for litigation, the Village of Airmont was finally incorporated in April 1991.

B. *The Present Lawsuits; Subsequent Events; the Jury Verdicts*

Two days after the Village was formally incorporated, the private plaintiffs commenced their present action, eventually naming as defendants the Village, ACA, Ramapo, and several leaders of the incorporation movement. Plaintiffs charged that Airmont's incorporation had been undertaken with the purpose of excluding Orthodox Jews, in violation of, *inter alia*, the First Amendment and the Fair Housing Act, and they sought damages and injunctive relief. Plaintiffs unsuccessfully moved for a preliminary injunction to prevent the election of Village officials; the district court denied their motion on the ground that they failed to make a showing of irreparable harm. *See Leblanc–Sternberg v. Fletcher*, 763 F.Supp. 1246, 1250–52 (1991). In May 1991, Village elections were held, and the slate of candidates supported by ACA was victorious. Defendant Maureen Kendrick, ACA president from 1988 through 1989, was elected Mayor; the four Village trustees were Fletcher, who was ACA president in 1991, Vertullo, who was an ACA member and a political ally of Fletcher, and defendants John Layne and Marianne Cucolo, who were ACA Board members. Defendant Raymond Kane, also an ACA Board member, was elected a Village trustee in 1992.

The United States commenced its action under the FHA against Airmont and its trustees in December 1991, alleging that the Village had been incorporated for the purpose of excluding Orthodox Jews through zoning restrictions on their places of worship. The government sought, *inter alia*, a declaratory judgment that the Village and its trustees had violated the FHA and an injunction against further violations. The private and government actions were consolidated for discovery and trial.

The private plaintiffs' damages claims were to be tried to a jury at the insistence of the defendants. Though plaintiffs, initially having requested a jury trial, sought to withdraw that request, defendants exercised their right to a jury trial on those claims. Accordingly, an approximately two-month consolidated trial was held before Judge Goettel, with a jury empaneled to decide the damages claims of the private plaintiffs, and the court to act as factfinder on their equitable claims and the claims of the government.

At trial, the government and the private plaintiffs introduced evidence of the events described above, as well as evidence that ACA had forcefully opposed and challenged

certain synagogue applications for HPO approval or for slight zoning variances. For example, in 1989, Rabbi Chaim Friedman, seeking to construct a free-standing synagogue, applied for a variance from the Ramapo Code's two-acre restriction because his lot was 1.926 acres; he also sought to include a structure on the lot that would be his residence. Approval of Rabbi Friedman's 1989 application was delayed by ACA opposition. Approval was initially given in 1991; final approval was given in May 1992 following the conclusion of a proceeding under N.Y.Civ. Prac.L. & R. Art. 78 ("Article 78"), brought by ACA member James Montone.

In 1989, Rabbi Sternberg applied for permission to conduct services in his home; ACA strongly opposed, sending six or more members to a Ramapo Planning Board meeting at which the application was to be considered. Each spoke in opposition to the application. According to plaintiff Fred Walfish,

> Mr. Fletcher said we knew when we moved to the area there were no houses of worship and we knew that the zoning ordinance didn't allow these residential houses of worship and we brought our own problems among ourselves and we should have never moved into the area.

(Tr. at 251.) The position expressed by ACA's then-president Kendrick, as described by Walfish, was similar:

> [t]hat we [Orthodox Jews] knew that there were no houses of worship when we moved here; we shouldn't ... have moved here; we were foreigners and interlopers coming from outside; we were ignorant and uneducated; [and that] the entire community was an insult to the people who lived there previously.

(*Id.*)

The Sternberg application was initially denied; it was then twice approved, with the restrictions that the HPO could be used only on Jewish holidays and the Sabbath and for no more than 40 congregants, and was twice successfully challenged on technical grounds in Article 78 proceedings financed by ACA. A third and final approval in 1991 did not meet a court challenge. By this time, Airmont had been incorporated. The Village decided not to pursue a third Article 78

proceeding; Cucolo, a Village trustee who was also an ACA board member, stated that the Village did not "have to pursue an Article 78, there are other ways we can harass them." (Tr. at 3599–600.) Thereafter, Montone and others posted themselves outside of Rabbi Sternberg's home to count the arriving congregants; Montone at other times parked in front of the homes of other Orthodox Jews during their prayer times.

Plaintiffs also introduced evidence that in January 1993, Airmont adopted its own zoning code ("Airmont Code"), modifying the Ramapo provision for home professional offices. Airmont's version requires that an HPO

> shall be incidental and secondary to the use of the residence for dwelling purpose, shall not change the character thereof and shall not have any evidence of such accessory use other than a permitted announcement sign. *It is the intent of this Local Law that the home professional office shall not generate activities that come into a residential area so as to detract from the residential character of the area.* Said activity shall not occupy more than one-half (½) of the ground floor area of the residence or its equivalent elsewhere in the residence if so used. In said activity, no more than two (2) persons, including members of the family residing on the premises, shall be employed. Permissible "home professional office" uses include, but are not limited to, the following: clergymen, lawyers, physicians, dentists, architects, engineers or accountants, *if said use meets the other requirements of this Local Law. Any aggrieved person shall apply to the Zoning Board of Appeals for an interpretation as to whether or not a proposed activity or use constitutes a permissible home professional office. It is the intent of this Local Law that the home professional office shall only be an accessory use and that the residential character of the neighborhood involved shall be maintained at all times.*

Airmont Code, art. XVIII(2) (unemphasized language in Ramapo Code § 376–181, at 37678; emphasized provisions added by Airmont). The Village appointed a Zoning

Board of Appeals and a Planning Board to interpret and apply the Airmont zoning code. Montone, who, *inter alia*, had stated at an ACA meeting his view that "most people were against houses of worship in residential areas," and had conducted surveillances of Orthodox Jewish homes at prayer times, was one of those appointed to the Airmont Planning Board. When the Airmont zoning code was adopted, Kendrick was the Village's mayor; Fletcher, Layne, and Kane were three of its four trustees. These four officials testified at trial that they were opposed to the Ramapo-type interpretation of the HPO provision to allow worship services in the homes of clergy. Plaintiffs contended that, in light of all that had occurred, the interpretation that Airmont would give its amended HPO provision was a foregone conclusion.

In defense, defendants contended that plaintiffs could not show any injury from defendants' conduct. Both the Friedman and Sternberg applications had eventually been approved by Ramapo's Planning Board. Although the Friedman synagogue had not been built, defendants argued that this was because of the loss of congregants and the Rabbi's failure to apply for necessary approval from state agencies. Defendants also attempted to show that the zoning concerns that led them to incorporate and to adopt a strict zoning policy were legitimate and non-discriminatory. Ramapo's Town Supervisor testified that an Orthodox Jew had complained about the expansion of a synagogue near his home. The granddaughter of an Orthodox Jewish rabbi testified that Ramapo had allowed a synagogue on a three-quarter-acre lot next to her home and that she had experienced terrible trouble with traffic, parked cars blocking her mailbox, noise, and spotlights. Kendrick testified that she had opposed the development in which Rabbi Sternberg's home was built on the basis that it was on a flood plain, that the land had once been a garbage dump and might have been contaminated, and that the new construction required the rerouting of the existing river bed.

Plaintiffs, however, introduced evidence that the zoning concerns of ACA and the Airmont trustees had been selective, focusing only on Orthodox synagogues. Thus, whereas home synagogues were opposed in part because they would result in traffic or noise, nonreligious uses of land that caused those problems were not opposed. For example, Kendrick did not complain about a recreational lake with tennis courts and a refreshment stand near her house, though she testified that on weekends these facilities attracted a hundred cars and hundreds of people. Similarly, a certain country club generated what one witness characterized as "a total nightmare between the traffic and the terrible noise." (Tr. at 5335.) Fletcher, however, had argued that ACA should not take action against the club, fearing that if the club were closed, the owner "was going to sell it to the Orthodox people to live on" (Tr. at 5344–45). And whereas ACA had opposed even a slight variance to allow Rabbi Friedman's congregation to build a synagogue on a lot that was nearly two acres, the ACA board members had unanimously declined to oppose a variance for a too-tall spire on a Catholic mausoleum, with Layne stating that they should take that position "because this is the Catholic church that wants it" (Tr. at 3025).

After the close of the evidence, the district court submitted the private plaintiffs' damages claims to the jury. The claims against several of the originally-named defendants had been settled or dismissed prior to trial; in addition, a default had been entered against ACA, which apparently had no remaining assets or officers. The private plaintiffs' surviving claims were those against Fletcher, Layne, Vertullo, Kendrick, Kane, and the Village.

The court submitted to the jury a special verdict form containing a number of interrogatories. For purposes of the present appeal, the pertinent interrogatories posed the following questions and required the jury to respond as to the Village and as to each of the other five defendants "Individually":

(1) "Did any of the Defendants violate Plaintiffs' fair housing rights?"

(2) "Did any of the Defendants conspire to violate Plaintiffs' constitutional rights to the free exercise of religion [or] free speech?"

Question (2) originally asked whether any defendants had conspired to violate plaintiffs' rights to exercise of religion "and" free speech; the "and" was changed to "or" in response to a question from the jury during deliberations as to whether, in order to find in favor of plaintiffs, it was required to find a conspiracy to violate both rights. The verdict form also asked the jury to state the dollar amount of damages to which each plaintiff was entitled against any defendant found to have violated that plaintiff's rights, and to make a finding as to whether a majority of the voters who had favored Airmont's incorporation were motivated in part by discrimination against Orthodox or Hasidic Jews.

After a week of deliberations, the jury returned a verdict finding in favor of the individual defendants on all questions, and finding that the majority of those voting in favor of incorporating Airmont had not been motivated by a discriminatory animus. However, the jury found against Airmont on questions (1) and (2), finding that the Village had violated the private plaintiffs' rights under the Fair Housing Act and had conspired to violate their rights under the First Amendment. The jury awarded zero damages.

The court promptly entered judgment on the verdict in the private plaintiffs's action, reciting (a) that the claims against the individual defendants were dismissed, (b) that the private plaintiffs had prevailed on jury interrogatories (1) and (2) against the Village, and (c) that plaintiffs were awarded zero damages. As described below, the court also denied plaintiffs' claims for injunctive relief.

## C. The Decisions of the District Court

Two days after the jury's verdict, the district court found against the government in the latter's action against the Village and the trustees for declaratory and injunctive relief. In a reported opinion dated December 15, 1993, see United States v. Village of Airmont, 839 F.Supp. 1054 ("Government Suit Opinion"), the district court found that the only action taken by the Village after its incorporation that could possibly support the government's claim was the 1993 adoption of the zoning code, which the court found not to be appreciably different from Ramapo's Code. The court stated that while the "minor" differences between Ramapo's Code and the one adopted by Airmont "arguably could be taken as a signal for a different interpretation," Government Suit Opinion, 839 F.Supp. at 1061, it was equally likely that, in order to avoid the cost of litigation, the Village might not interpret its code to prevent the use of HPOs by Orthodox and Hasidic rabbis for worship services:

Viewing the evidence in the light most favorable to the Government, we can foresee that the Planning Board and the Zoning Board of Appeals (to the extent the matter might be submitted to it) will not adopt the Ramapo interpretation of the home professional office exception. It may also be true that the absence of actions by the Village and its officials adverse to Orthodox and Hasidic Jewish interests has been due in part to the existence of the ... lawsuits. However, it may equally be true that, having learned the extreme costs of litigation from these lawsuits, the Village will have no interest in taking actions against residential synagogues or doing anything else which has an adverse effect on the availability of housing for Orthodox or Hasidic Jews.

Id. at 1064 (footnote omitted). The court stated that if the Village of Airmont had developed a reputation as a community that was hostile to Orthodox and Hasidic Jews, "it is largely the result of these ... lawsuits brought against it by the various plaintiffs and the extensive publicity plaintiffs have intentionally generated." Id. at 1062–63.

The court concluded that because the Village itself had done nothing but adopt its own zoning code and had not yet been called upon to apply it, the government had not established a case for injunctive relief. The court took note of the government's argument that " '[a] suit for an injunction deals primarily not with past violations but with threatened future ones; ... [and that] an injunction may issue to prevent future wrong, although no right has yet been violated' " (Government's proposed findings of fact

and conclusion of law (quoting *Swift & Co. v. United States*, 276 U.S. 311, 326, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928))), but the court ruled that *Swift* was inapposite because it involved enforcement of a consent decree, and the Village had not entered into such a decree. The court concluded that

> if there is any action taken in the future which violates their rights, the United States Government and other plaintiffs will not be timorous about suing. Consequently, we see no basis or need for injunctive relief.

*Government Suit Opinion*, 839 F.Supp. at 1064. The court also stated its view that the type of injunctive relief requested by the government was inappropriate, stating, *inter alia*, that an injunction prohibiting Airmont from denying persons their constitutional or legal rights on account of their religion was unnecessary because it would merely enjoin acts that are already illegal. *See id.* at 1065.

In entering its initial judgment in the private plaintiffs' action, the district court, in addition to dealing with plaintiffs' damages claims in accordance with the jury verdicts, denied plaintiffs' claims for injunctive relief against the Village on the basis of its view of the evidence as set forth in its *Government Suit Opinion:*

> The court [after the jury returned its verdict] determined that the plaintiffs were not entitled to the injunctive relief requested in the complaint under the evidence presented at trial as set forth in the Court's opinion in United States of America -vs- The Village of Airmont which was tried jointly but without a jury and the jury's answers to the special interrogatories . . . .

Following the issuance of the district court's decision against the government and the entry of the judgment in the private action, the Village timely moved under Fed. R.Civ.P. 50(b) for judgment as a matter of law ("JMOL"). In a reported opinion dated March 16, 1994, *see LeBlanc–Sternberg v. Fletcher*, 846 F.Supp. 294 ("*JMOL Opinion*"), the court granted the motion, stating that the verdict appeared to be internally inconsistent because the jury had found in favor of the individual defendants but "did not award any damages, not even the $1 nominal damages it could have awarded on the civil rights claim." *JMOL Opinion*, 846 F.Supp. at 295. On the basis of the facts it had found with respect to the government's claim, the court concluded that the Village was entitled to judgment as a matter of law dismissing the claims of the private plaintiffs:

> Directly after the jury reached its verdict, the court issued its 34 page opinion on the bench trial of the case brought by the United States Government, finding for the Village and its Trustees. The facts recited in that opinion, as well as the legal conclusions reached therein, are hereby made a part of this decision as if set forth herein in full. The decision focused on the fact that the Village had not taken any significant action with respect to the claimed unfair housing and anti-religious practices. The Government's response, in essence, was that it had not done so simply because of the existence of the litigation against it and that in light of the prejudices of the individual defendants in this case (and certain of their successors), it might well do so in the future. We pointed out, *inter alia*, that, while zoning regulations and their interpretations could be, under some circumstances, unconstitutional and violations of the Fair Housing Act, such acts had not yet occurred and, indeed, might never occur. Consequently, there was no basis for injunctive relief at this time.
>
> The same reasoning which le[ ]d us to conclude that the Government had not proved the case against the Village of Airmont in its action also leads us to conclude that there was no possible basis for the jury's verdict against the Village.

*JMOL Opinion*, 846 F.Supp. at 295–96 (footnote omitted). The court added that

> [t]he only thing the plaintiffs can point to as an act of the Village was the adoption of the zoning code in January of 1993, almost two years after the commencement of this action. The adoption of the zoning code did not result in any amendment to the complaint of this action. Furthermore, no action has been taken as to the plaintiffs (or any other synagogue) under the newly adopted code. These plaintiffs, like

the Government, argue that the Airmont zoning code, while quite similar to the pre-existing Town of Ramapo code, had a couple of changes in it which suggest a likelihood that, if the issue comes before them, the Airmont Planning Board and Zoning Board would not adopt the Ramapo solution with respect to home synagogues (known as "shteebles"). Even if this proves to be the case, it can have no impact on these plaintiffs, who have already gotten their zoning permission and who would be, at worst, a non-conforming use under the new zoning law.

The plaintiffs also argue that the existence of the Village has a "chilling effect" on their protected class. However, 33 new Orthodox Jewish families moved in to the Park Avenue area, following the formation and operation of the Village. Consequently, we can see no basis in fact or law for the jury's verdict.

*Id.* at 296 (footnote omitted).

## II. DISCUSSION

On appeal, the government contends principally that the district court erred in failing to recognize the Fair Housing Act's authorization of injunctive relief for anticipated future violations. The private plaintiffs contend principally that the court could not properly enter judgment against them as a matter of law on their claims against the Village; they also contend that the court erred in failing to award them nominal damages on those claims, and that because of errors in the court's instructions and evidentiary rulings, they are entitled to a new trial on their claims against the individual defendants. Fletcher and Vertullo, on their cross-appeal, argue that they should have been granted judgment as a matter of law at the close of the private plaintiffs' case.

For the reasons below, we conclude that the evidence was sufficient to establish that Airmont violated the private plaintiffs' rights under the Fair Housing Act and the First Amendment; that the district court was not entitled to set aside the jury's verdict against the Village on those claims on the basis of the court's own findings in the government's action; that in light of the established violation of their rights, the private plaintiffs were entitled to an award of nominal damages; that the jury's verdict against the Village constituted collateral estoppel that required the court to find that the government had established a violation by the Village; and that in ruling that injunctive relief was not appropriate, the court failed to apply pertinent FHA principles. We reject the private plaintiffs' appeal against the individual defendants, and we dismiss the cross-appeal as moot.

### A. *The Private Plaintiffs' Claims*

#### 1. *Fair Housing Act Principles*

■ The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of ... religion." 42 U.S.C. § 3604(a). The phrase "otherwise make unavailable" has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions. *See, e.g., Huntington Branch, National Association For the Advancement of Colored People v. Town of Huntington,* 844 F.2d 926, 938 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam); *Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 257 n. 6 (1st Cir.1993).

■ The FHA confers standing to challenge such discriminatory practices on any "aggrieved person," 42 U.S.C. § 3613(a)(1)(A). That term is defined to include

any person who—

(1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

42 U.S.C. § 3602(i). This definition requires only that a private plaintiff allege "injury in fact" within the meaning of Article III of the Constitution, that is, that he allege "distinct and palpable injuries that are 'fairly traceable' to [defendants'] actions." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 375–76, 102 S.Ct. 1114, 1122–23, 71 L.Ed.2d 214

(1982). An injury need not be economic or tangible in order to confer standing. *See, e.g., id.* at 376, 102 S.Ct. at 1123 (deprivation of social benefits of living in an integrated neighborhood constitutes cognizable injury); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 111–12, 99 S.Ct. 1601, 1613–14, 60 L.Ed.2d 66 (1979) (same). *See also* H.R.Rep. No. 711, 100th Cong.2d Sess. 23, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2184 (current statutory definition of "aggrieved person" was meant "to reaffirm the broad holdings" of *Havens Realty Corp. v. Coleman* and *Gladstone, Realtors v. Village of Bellwood* ).

■ Further, the explicit grant of standing to anyone who believes he *"will* be injured by a discriminatory housing practice *that is about to occur,"* 42 U.S.C. § 3602(i) (emphasis added), means that a person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit. Thus, where it has been established that a zoning ordinance will likely be applied in a discriminatory manner, it is unnecessary that the municipality actually so apply it before the ordinance may properly be challenged. For example, in *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208, 1214–16 (8th Cir.1972), the defendant city contended that its incorporation and adoption of restrictive zoning ordinances created no harm that was yet justiciable because none of the plaintiffs had yet filed a building permit application that had been rejected. The Eighth Circuit rejected this contention, holding that the plaintiffs had alleged a cognizable harm under the FHA:

> The plaintiffs contend that the incorporation and the subsequent adoption of the zoning ordinance were aimed directly at the Park View apartments, and that these are unconstitutional actions by the city. There is no doubt but that the zoning ordinance forbids the building of these apartments. It forbids all apartments. It would be futile to require the plaintiffs to proceed any further at the local level.

*Id.* at 1216.

■ An FHA violation may be established on a theory of disparate impact or one of disparate treatment. *See Huntington Branch, National Association For the Advancement of Colored People v. Town of Huntington,* 844 F.2d at 934–35. Under the latter theory, a plaintiff can establish a *prima facie* case by showing that animus against the protected group "was a significant factor in the position taken" by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. *United States v. Yonkers Board of Education,* 837 F.2d 1181, 1217, 1223, 1226 (2d Cir.1987) (*"Yonkers"*), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons. *See, e.g., id.* at 1218–19 (where site restrictions on low-income housing were imposed with segregative motive, fact that town had no duty to provide low-income housing was not significant); *United States v. City of Parma,* 661 F.2d 562, 574–75 (6th Cir.1981) (city's abandonment of application for federal housing funds for racially discriminatory reasons violated FHA), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982).

■ Discriminatory intent may be inferred from the totality of the circumstances, including "the fact, if it is true, that the law bears more heavily on one [group] than another," *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976), as well as

> the 'historical background of the decision ...'; '[t]he specific sequence of events leading up to the challenged decision,' ...; 'contemporary statements by members of the decisionmaking body ...'; ... and '[s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached,'

*Yonkers,* 837 F.2d at 1221 (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267–68, 97 S.Ct. 555, 564–65, 50 L.Ed.2d 450 (1977)); *see also United States v. City of Black Jack,* 508 F.2d 1179, 1185 n. 3 (8th Cir.1974) (racist statements by "leaders of the incorporation movement" and fact that "[r]acial criticism

... was made and cheered at public meetings" could be considered evidence of improper purpose), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

On a claim for damages under the FHA, either party is entitled, under the Seventh Amendment, to demand a jury trial. *See Curtis v. Loether,* 415 U.S. 189, 192, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974). If the claim for damages "is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact." *Id.* at 196 n. 11, 94 S.Ct. at 1009 n. 11.

### 2. *Principles Governing First Amendment Claims and Claims Under §§ 1983 and 1985*

The First Amendment, which is applicable to the states through the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), prohibits the states from making any law prohibiting the free exercise of religion. While it is unclear to what extent this prohibition requires states affirmatively to accommodate religious practice, *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* — U.S. —, —, 113 S.Ct. 2217, 2243, 124 L.Ed.2d 472 (1993) (Souter, J., concurring) (discussing tension among Supreme Court holdings), it is firmly established that "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law ... is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest," *id.* at —, 113 S.Ct. at 2227 (majority opinion), a test that the law will survive "only in rare cases," *id.* at —, 113 S.Ct. at 2233. "[A] law targeting religious beliefs as such is never permissible." *Id.* at —, 113 S.Ct. at 2227. *See also* 42 U.S.C. §§ 2000bb(b)(1), *et seq.,* (restoring the "compelling interest" and "least restrictive means" tests after the Supreme Court had held in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), that facially neutral laws would no longer be subject to this level of scrutiny under the First Amendment). In determining whether a law is based on religious ani-

mus, the same kinds of evidence noted above with respect to a disparate treatment claim under the FHA are relevant. *See generally Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* — U.S. at — – —, 113 S.Ct. at 2230–31 (Kennedy, J., concurring) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 267–68, 97 S.Ct. at 564–65).

A violation of one's rights under the Free Exercise Clause of the First Amendment may, in some circumstances, be actionable under federal civil rights statutes. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States, 42 U.S.C. § 1983, including the First Amendment right to the free exercise of religion, *see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* — U.S. at —, 113 S.Ct. at 2224. Where a municipality's own policies deprive individuals of their federal rights, the municipality itself may be held liable. *See generally Monell v. New York City Department of Social Services,* 436 U.S. 658, 690–94, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978).

Since the loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury, *see, e.g., Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion) (freedom of association); *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir. 1991) (freedom of expression), the victim of a conspiracy to violate First Amendment freedoms has standing to bring suit before the conspiracy has resulted in economic or tangible injury. *Cf. Virginia v. American Booksellers Association, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988) (facial First Amendment challenge to law limiting display of sexually explicit material, prior to law's enforcement, was not premature).

Section 1985(3) creates a cause of action where "two or more persons in any State ... conspire ... for the purpose of depriving ... any person or class of persons

of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). This section is applicable only if the plaintiff can show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Though the mere fact that "individuals ... share a desire to engage in conduct" does not render them a "class" under § 1985(3), *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, ——, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993), proof that the defendants' impetus was the plaintiffs' religion suffices, *see Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,* 968 F.2d 286, 291 (2d Cir.1992); *Colombrito v. Kelly,* 764 F.2d 122, 130–31 (2d Cir.1985); *see also* Remarks of Senator Edmunds during debate preceding passage of Civil Rights Act of 1871, Cong.Globe, 42d Congress, 1st Sess. 567 (1871) (if a "conspiracy was formed against [a] man ... because he was a Catholic, or because he was a Methodist ... then this section could reach it"). *Accord Taylor v. Gilmartin,* 686 F.2d 1346, 1356–58 (10th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); *Ward v. Connor,* 657 F.2d 45, 48 (4th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982).

Establishment of a § 1985(3) claim requires proof of a conspiracy between "two or more persons." A conspiracy, for these purposes, need not be shown by proof of an explicit agreement but can be established by showing that the "parties have a tacit understanding to carry out the prohibited conduct." *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988); *see also United States v. Wardy,* 777 F.2d 101, 107 (2d Cir. 1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986); *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir.1990) (conspiracy may be established by showing that "participants in the conspiracy ... share the general conspiratorial objective") (internal quotes omitted), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). The term "persons" for purposes of § 1985(3) includes municipalities, *see Owens v. Haas,* 601

F.2d 1242, 1247 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), and a claim under § 1985(3) may be established against a state if "it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State," *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 830, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983).

The district court instructed the jury on the elements of plaintiffs' causes of action under the FHA, § 1983, and § 1985(3). Although conspiracy is not a necessary element of a § 1983 claim, the court and the parties apparently viewed jury interrogatory (2), notwithstanding its reference to conspiracy ("Did any of the Defendants conspire to violate Plaintiffs' constitutional rights to the free exercise of religion [or] free speech?"), as encompassing not only the claims under § 1985(3) but also those under § 1983.

### 3. *Verdict Consistency*

One of the grounds on which the district court entered judgment as a matter of law against the private plaintiffs was that it believed the jury's verdict against the Village to be inconsistent with the jury's other verdicts. *JMOL Opinion,* 846 F.Supp. at 295. Though a judgment should not be entered awarding a plaintiff relief on the basis of inconsistent jury findings, *see generally Brooks v. Brattleboro Memorial Hospital,* 958 F.2d 525, 529 (2d Cir.1992); 5A *Moore's Federal Practice* ¶ 49.03[4], at 49–39 to 49–43 (2d ed. 1994 & Supp.1995), we have several difficulties with the court's action here.

First, if the answers returned by the jury appear to be inconsistent with one another, "[i]t is the duty of the district court to attempt to harmonize the jury's answers, if it is at all possible under a fair reading of the responses." 9A C. Wright & A. Miller, *Federal Practice and Procedure,* § 2510, at 200–01 (2d ed. 1995). Thus, "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines,*

*Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); *see, e.g., Brooks v. Brattleboro Memorial Hospital*, 958 F.2d at 529; *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir.1988).

■■■ Second, in dealing with jury responses that are inconsistent, proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards any material jury finding. *See, e.g., Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. at 364, 82 S.Ct. at 786; *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d at 890–91. Thus, if there is no way in which the jury's answers may be harmonized, the court must order a new trial. *Id.* at 891. Our responsibility as a reviewing court is the same. It is not the province of either court simply to enter a judgment that overrules some of the jury's findings.

In sum, if the district court in the present case considered the jury's verdict of liability against the Village to be inconsistent with the verdicts in favor of the individual defendants or the denial of damages, the court should have sought an explanation, supportable by the record, that was not inconsistent. If it failed to find such an explanation, it should have ordered a new trial. If we concurred in the district court's view that the jury's verdicts were inconsistent, we would vacate the judgment dismissing the private plaintiffs' complaint and remand for a new trial.

Given the record in this case, however, we are not in agreement with the district court's assessment that because only the Village, and not the remaining individual defendants, was found to have violated the private plaintiffs' rights under the FHA and to have conspired to violate their First Amendment rights, the verdicts were internally inconsistent. To the contrary, as discussed below, these findings were consistent with each other, were supported by the evidence, and evinced obedience to the trial court's instructions.

■■■ In finding that only the Village violated the private plaintiffs' rights under the Fair Housing Act, the jury may have been persuaded that the only violative act was the enactment of the Airmont zoning code. It is a fair inference that the jury viewed the Village's enactment of that code, with provisions facilitating rejection of HPO applications, as an act that was designed to limit the number of home synagogues and that was thus about to make dwellings unavailable to Orthodox Jews because of their religion. The fact that the jury did not find that the individual defendants so acted was not inconsistent with the finding that the Village itself had committed the violation, because the enactment was that of the Village and the trial court had given an instruction, in response to a question from the jury during its deliberations, that under the doctrine of "legislative immunity," "Village officials who vote for the passage of something cannot be held liable for damages by voting for it." (Tr. at 5855.)

Nor was there inconsistency in the jury's findings that only the Village, and none of the five remaining individual defendants, had conspired to violate plaintiffs' First Amendment rights. As to the § 1985(3) claim, though a conspiracy requires at least two coconspirators, the court had instructed the jury that "the law recognizes a corporation and its officers ... as a single entity" (Tr. at 5668–69). Thus, the jury had been advised that it could not find a conspiracy between the Village and its officers. More importantly, the only persons other than the Village about whom the jury was asked were Fletcher, Layne, Vertullo, Kendrick, and Kane, and it is easily inferable that the jury found that the Village had conspired with someone about whom the jury was not expressly asked, to wit, ACA. No interrogatory was posed with respect to ACA, apparently because the court had previously entered a default against it. There was abundant evidence, however, that ACA had persistently urged incorporation of the Village expressly in order to gain control of zoning in order to keep Orthodox and Hasidic Jews from moving to the Airmont area. For example, at a meeting at which the proposed incorporation was discussed, an ACA member asked, "What does the Airmont Civic Association and the proposed village plan to do to keep these Hasidum [*sic*] out?" (Tr. at 2989.) After the Village's incorporation, ACA's slate

of candidates was elected to be Airmont officers; and the Village proceeded to appoint the ever-vigilant, anti-HPO, ACA member Montone to one of the Airmont zoning bodies. In short, the evidence amply permitted the jury to find that ACA and the Village shared a general conspiratorial objective and that ACA was a coconspirator in the Village's adoption of a zoning code that was intended to be applied to achieve ACA's announced discriminatory goal.

Further, though conspiracy is not a necessary ingredient of a claim pursued under § 1983, the jury's finding that the Village had conspired to violate plaintiffs' First Amendment rights, like its finding that the Village had violated their rights under the FHA, sufficed to establish the Village's liability under § 1983.

The jury's finding that the private plaintiffs had not suffered monetary damages "as a result of the actions by any Defendant" was explainable by the evidence that there had been no applications for pertinent variances or home synagogues under the Airmont code, and by the trial court's failure to instruct the jury that if it found a civil rights violation it must award at least nominal damages. As discussed in Part II.A.5. below, the court had instructed the jury only that it "may" award nominal damages.

In sum, the jury's verdicts are consistent with fully supportable findings that ACA and the Village conspired to impede the private plaintiffs' exercise of their rights under the First Amendment; that the Village adopted a zoning code that was intended to, and would be interpreted to, curtail home synagogues, thereby deterring Orthodox Jews from purchasing homes in many Airmont neighborhoods; and that because no applications had been made for HPO or variance approvals under the Airmont code, the plaintiffs had not suffered an injury for which the jury wished to award damages.

In recognition of the parties' Seventh Amendment rights to have the private plaintiffs' claims decided by the jury, the district court was required to accord the jury's verdicts an interpretation such as this, which is reasonable, supported by the evidence, and not internally inconsistent.

### 4. Sufficiency of the Evidence To Withstand a Rule 50(b) Motion

The other ground on which the district court set aside the jury's verdict against the Village was that that verdict did not accord with the court's own findings. This was not a proper basis on which to rule on the Village's Rule 50(b) motion.

In ruling on a motion for judgment as a matter of law under Fed.R.Civ.P. 50(b), formerly called a judgment notwithstanding the verdict ("n.o.v."), *see Piesco v. Koch,* 12 F.3d 332, 340 (2d Cir.1993) (though Rule 50(b) was amended in 1991 to replace the term "judgment n.o.v." with the phrase "judgment as a matter of law," the substance of the Rule was not changed), a district court is required to

consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury,

*Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 367 (2d Cir.1988) (internal quotes omitted); *see Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994); *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970). Only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party]" may the court properly grant the motion. *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) (internal quotes and alterations omitted). The same standard governs appellate review of a decision granting or denying judgment as a matter of law. *See, e.g., Binder v. Long Island Lighting Co.,* 57 F.3d at 198–99 (grant); *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d at 889 (denial).

In the present case, in granting the Village's Rule 50(b) motion against the pri-

vate plaintiffs, the district court noted that the court's own 34-page opinion had found in favor of the Village in the suit brought by the government; and it made "[t]he facts recited in that opinion ... a part of this decision as if set forth herein in full," *JMOL Opinion,* 846 F.Supp. at 295. The court stated that "[t]he same reasoning which le[ ]d us to conclude that the Government had not proved the case against the Village of Airmont in its action also leads us to conclude that there was no possible basis for the jury's verdict against the Village," *id.* at 295–96. We have several difficulties with this ruling.

First, despite the court's ultimate findings in favor of the Village, several of its own statements in the *Government Suit Opinion* belie its *JMOL Opinion* statement that there was no possible basis for the jury's verdict against the Village. For example, in its *Government Suit Opinion,* the court stated that Airmont's changes to the language used in the Ramapo Code "could be taken as a signal for a different interpretation." *Government Suit Opinion,* 839 F.Supp. at 1061. The court stated as well that "[i]t may also be true that the absence of actions by the Village and its officials adverse to Orthodox and Hasidic Jewish interests has been due in part to the existence of [these] lawsuits." *Id.* at 1064. Further, the court acknowledged that "[v]iewing the evidence in the light most favorable to the Government, we can foresee that the Planning Board and the Zoning Board of Appeals ... will not adopt the Ramapo interpretation of the home professional office exception." *Id.* Had the government's suit been the only case tried, the court acting as factfinder of course would not have been required to view the evidence in the light most favorable to the government (or any party). In ruling on the motion by the Village for judgment as a matter of law, however, the court was required to view the evidence in the light most favorable to the private plaintiffs. Plainly the court's decision in the government's case rejected the view of the evidence that was most favorable to the plaintiffs, as the court ultimately concluded that the differences between the Ramapo Code and the Airmont provision were inconsequential and that the latter might not be interpreted to prevent home synagogues.

Moreover, given the plethora of statements in the record attributed to ACA leaders who became Village officials, expressing anti-Orthodox Jewish sentiments (*e.g.,* by Kendrick, who eventually became mayor (describing Orthodox Jews as "foreigners and interlopers," who were "ignorant and uneducated" and "an insult to" the community); Fletcher, who eventually became a trustee ("the only reason we formed this village is to keep those Jews from Williamsburg out of here"); and Cucolo as a trustee (Village did not "have to pursue an Article 78 [with respect to Rabbi Sternberg's home synagogue], there are other ways we can harass them")), the court's finding that any reputation that the Village might have had for being hostile to Orthodox Jews had been created by the plaintiffs themselves was inconsistent with a viewing of the evidence in the light most favorable to plaintiffs.

Second, though the court stated that it was granting the Village's Rule 50(b) motion " 'without ... considering the weight of the evidence,' " *JMOL Opinion,* 846 F.Supp. at 296 (quoting *Simblest v. Maynard,* 427 F.2d at 4), its reasoning indicates that it did weigh the evidence, for it incorporated in its *JMOL* ruling all of the findings it had made in the *Government Suit Opinion.* In the latter, it rejected the "foresee[able]" event that Airmont would interpret its code to deny home synagogue permits, finding it "equally" possible that the Village might forbear from such denials because of the cost of litigation. *Government Suit Opinion,* 839 F.Supp. at 1064. Such assessments of permissible competing factual inferences plainly bespeak a weighing of the evidence.

Finally, and most importantly, whatever its own view of the facts may have been, the court was not entitled to substitute its view for adequately supported findings that were implicit in the jury's verdict. The evidence showed that Orthodox Jews need to be able to worship in a group large enough to guarantee a minyan but close enough to home to allow them to walk to services on their Sabbath and holy days. That need appears to be unique to Orthodox and Hasidic Jews, as only these groups had applied to conduct services in their clergy's homes under Rama-

po's HPO provision. The plaintiffs' evidence showed that building a synagogue on a lot more than two acres in size, instead of using home synagogues, would not be economically feasible. The defendants who were the Village's mayor and three of its four trustees when the Village adopted its own zoning code testified that they opposed approvals for home synagogues.

The events cited by ACA leaders as evincing a need for Airmont's incorporation and gaining control of zoning amply supported a finding that the impetus was not a legitimate nondiscriminatory reason but rather an animosity toward Orthodox Jews as a group. They wrote and spoke of Ramapo's interpretation of its HPO provision to permit home synagogues and of its adoption of multiple-family housing as leading to the "grim picture of a Hasidic belt." They cited potential traffic and noise problems among their reasons for opposing home synagogues but tolerated existing traffic and noise caused by secular uses; indeed, such problems emanating from a country club were deliberately ignored for the stated reason that if they were challenged, the owner might sell the property to Orthodox Jews. And whereas ACA opposed even a slight zoning variance for the construction of a synagogue on a lot that was very nearly two acres, there was testimony that its board unanimously elected not to oppose a height variance for a Catholic mausoleum spire "because this is the Catholic church that wants it."

Lest the events themselves left any doubt, the record is replete with other statements of anti-Hasidic animus made or adopted by ACA leaders, such as, "i [*sic*] *will not* have a hasidic community in my backyard" (emphasis in original); and "the reason of forming this village is to keep people like you out of this neighborhood."

Taking the evidence in the light most favorable to the private plaintiffs, there was ample support for the jury's implicit finding that Airmont's zoning code would be interpreted to restrict the use of home synagogues, that the motivation behind the enactment was discriminatory animus toward Orthodox and Hasidic Jews, and that Airmont pursued this goal jointly with ACA. Accord-

ingly, the private plaintiffs established the Village's liability on the claims asserted under the FHA, the First Amendment, and §§ 1983 and 1985(3).

### 5. Entitlement to Nominal Damages

▮ A plaintiff who has proven a civil rights violation but has not proven actual compensable injury, is entitled to an award of nominal damages. *See, e.g., Cabrera v. Jakabovitz*, 24 F.3d 372, 391 (2d Cir.) (upholding district court's award of such damages in FHA action notwithstanding jury's refusal to award them), *cert. denied,* — U.S. ——, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Gibeau v. Nellis*, 18 F.3d 107, 110–11 (2nd Cir.1994) (in § 1983 action, "an award of nominal damages is not discretionary where a substantive constitutional right has been violated"); *McKenna v. Peekskill Housing Authority*, 647 F.2d 332, 335–36 (2d Cir.1981) (where First Amendment claim was established, "[i]f no actual damages exist, the district court is directed to enter a judgment for nominal damages in favor of the plaintiffs"). It is plain error for the trial court to instruct a jury only that, if the jury finds such a violation, it "may" award such damages, rather than that it must do so. *See Gibeau v. Nellis*, 18 F.3d at 110–11. Where a trial court has committed such an error, and the plaintiff has been awarded no actual damages, we will remand for the award of nominal damages. *See id.* at 111.

In the present case, the district court instructed the jury that if it found the defendants had violated the private plaintiffs' rights but that plaintiffs had suffered no actual damages, the jury "may" award plaintiffs nominal damages. (Tr. at 5686.) Since the jury found that the Village violated the private plaintiffs' FHA rights and conspired to violate their First Amendment rights, the Village's liability on the claims asserted under the FHA, § 1983, and § 1985(3) was established; since the jury found that plaintiffs were not entitled to compensatory damages, plaintiffs should have been awarded nominal damages.

### 6. The Private Plaintiffs' Equitable Claims

▮ We also conclude that the district court erred in its denial of the private plain-

tiffs' claims for injunctive relief, which, unlike their damages claims, were tried to the court. When two claims asserted by the same plaintiff are tried together and one is to be decided by the jury and the other by the judge, principles of collateral estoppel prevent the judge from making findings of fact contrary to those of the jury. *See, e.g., Curtis v. Loether*, 415 U.S. at 196 n. 11, 94 S.Ct. at 1009 n. 11 (noting that in FHA suit, right to jury trial applies to all issues common to both legal and equitable claims, citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (noting that in FHA suit, right to jury trial applies to all issues common to both legal and equitable claims, citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (where legal and equitable claims are asserted in the same suit, legal claims must be decided first so that right to jury trial on legal issues will not "be lost through prior determination of equitable claims," *id.* at 511, 79 S.Ct. at 957), and *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470–73, 82 S.Ct. 894, 896–97, 8 L.Ed.2d 44 (1962) (same)); *Sorlucco v. New York City Police Department*, 971 F.2d 864, 873–74 (2d Cir.1992); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir.1988). Indeed, in order to safeguard the parties' Seventh Amendment rights with respect to claims triable to the jury, the general rule is that the jury must be allowed to decide the legal claims prior to the court's determination of the equitable claims, *see, e.g., Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959); *Wade v. Orange County Sheriff's Office*, 844 F.2d at 954, in order to prevent the court's determination of a common factual issue from precluding a contrary determination by the jury through collateral estoppel.

▆ Though the decisions in the present case were rendered in the proper sequence, the court's decision disregarded the estoppel effect to be given to the jury's verdict. In denying the injunctive relief requested by the private plaintiffs against the Village, the court disregarded the jury's findings against the Village and relied instead on the court's own findings in favor of the Village. The judgment stated, in pertinent part, that "[t]he court ... determined that the plaintiffs were not entitled to the injunctive relief requested in the complaint under the evidence presented at trial as set forth in the Court's opinion in [the government's suit]." Though the granting or denial of injunctive relief lies within the court's discretion, a failure to apply a controlling legal principle constitutes an abuse of discretion, and the court here, in relying on its own findings that were inconsistent with the jury's findings, failed to apply controlling principles of collateral estoppel.

On remand, the court should consider, in light of the findings that the Village violated the Fair Housing Act and conspired to violate plaintiffs' First Amendment rights, whether injunctive relief may also be appropriate.

### 7. The Claims Against the Individual Defendants

The private plaintiffs also contend that they are entitled to a new trial on their § 1983 claims against the individual defendants, principally because the district court instructed the jury that the conduct of those defendants in pressing for Airmont's incorporation could not be considered state action. We reject plaintiffs' contention.

▆ In certain contexts, private actors' conduct can be considered state action and thus governed by constitutional constraints that normally apply only to state and local governments. In *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Supreme Court ruled that peremptory challenges to jurors by attorneys in civil litigation constituted state action, *see id.* at 622, 111 S.Ct. at 2083, applying the two-part test formulated in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982), for determining whether a given set of acts qualifies as state action. That test asks "first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority, ... and second, whether the pri-

vate party charged with the deprivation could be described in all fairness as a state actor," *Edmonson v. Leesville Concrete Co.*, 500 U.S. at 620, 111 S.Ct. at 2082. With respect to the second question, the court is to consider "the extent to which the actor relies on governmental assistance and benefits ...; whether the actor is performing a traditional governmental function ...; and whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at 621–22, 111 S.Ct. at 2083–84.

■ A drive for incorporation does not meet this test. The circulation of petitions for a referendum on incorporation is typically carried out by private persons in their individual capacities. The proponents may or may not collect enough signatures to call for the referendum. If there is a referendum, a majority of those voting may or may not vote for incorporation. *See generally* N.Y. Village Law §§ 2–200, 2–202, 2–212, 2–222 (McKinney 1973 & Supp.1995) (territory of not more than five square miles, having at least 500 residents, may be incorporated after a referendum upon petition by at least 20 percent of the voting residents of that territory or by the owners of more than 50 percent of the territory's real property, measured by assessed value). If a majority of the voters do vote in favor, the ensuing creation of the village itself results from the "application of a neutral state law designed to give almost any group of residents the right to incorporate." *Board of Education of Kiryas Joel Village School District v. Grumet*, —— U.S. ——, —— n. 7, 114 S.Ct. 2481, 2491 n. 7, 129 L.Ed.2d 546 (1994). The incorporation is merely a change in status that gives the incorporated body certain powers. The status itself does not necessarily indicate how those powers will be used. *See id.* at ——, 114 S.Ct. at 2505 (Kennedy, J., concurring) ("People who share a common religious belief or lifestyle may live together without sacrificing the basic rights of self-governance that all American citizens enjoy, so long as they do not *use* those rights to establish their religious faith." (Emphasis added.)).

The power of a village to adopt a zoning code has its source in state authority, and Airmont's adoption of its own zoning code

with its differences from the Ramapo Code to facilitate the rejection of HPOs, was of course state action. But it was that enactment, rather than the mere achievement of incorporated status, that affected zoning and the plaintiffs' rights. Accordingly, the district court did not err in instructing the jury that the individuals' acts to have the Village incorporated did not constitute state action.

We have considered all of plaintiffs' arguments in support of their contention that they did not receive a fair trial of their claims against the individual defendants and have found in them no basis for reversal. Accordingly, we affirm so much of the judgment in the private plaintiffs' suit as dismissed the claims against those defendants.

In light of this decision, the cross-appeal of Fletcher and Vertullo, arguing that they were entitled to judgment as a matter of law at the close of the private plaintiffs' case, is moot.

### B. *The Government's Action*

The government's action asserted claims only under the Fair Housing Act. Under that Act, the basic principles of which are discussed in Part II.A.1. above, the Attorney General of the United States has authority to enforce the Act by bringing a civil action if she determines that the violation "raises an issue of general public importance." 42 U.S.C. § 3614(a). Like the private plaintiffs' equitable claims, the government's FHA claim against the Village and its trustees was tried to the district court rather than to the jury, and the district court found that no violation had occurred. *Government Suit Opinion*, 839 F.Supp. at 1068. As discussed in Part II.A.6. above, the jury's findings on plaintiffs' legal claims constituted collateral estoppel, preventing the court from making contrary findings as the factfinder with respect to the private plaintiffs' equitable claims. We conclude that the same principle should have constrained the court's findings in the government's suit.

■ In federal court, the applicability of collateral estoppel is not limited to cases in which there is a complete identity of parties. Offensive collateral estoppel, *i.e.*, foreclosing

a defendant from relitigating an issue that it has litigated unsuccessfully in another action, *see Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552 (1979), is also available to a new plaintiff when the defendant had essentially the same opportunity and incentive to litigate the issue fully and fairly in the other suit. *Parklane Hosiery* counsels against the application of nonmutual offensive collateral estoppel in cases where (1) the judgment relied on as the basis for estoppel is itself inconsistent with an earlier judgment in favor of the defendant; (2) the issue on which the plaintiff seeks to estop the defendant was not necessary to the prior judgment; or (3) the new plaintiff deliberately failed to participate in a prior suit for tactical reasons. *See id.* at 330–32, 99 S.Ct. at 651–52.

■ On the record before us, none of the considerations that would justify a refusal to allow the use of offensive collateral estoppel is present. The findings of the jury with respect to the private plaintiffs' FHA claims against the Village necessarily determined all of the liability issues in the government's FHA claim against the Village. As the cases were tried jointly, there can be no question that the Village had the opportunity to, and did, fully and fairly litigate the issues. Since, as discussed above, the jury's verdict was fully supportable by the record, the district court was bound to respect that verdict and could not properly make findings that contradicted it. While for practical and policy reasons nonmutual offensive collateral estoppel is not routinely available *against* the government, *United States v. Mendoza,* 464 U.S. 154, 159–64, 104 S.Ct. 568, 571–74, 78 L.Ed.2d 379 (1984); *see id.* at 160, 104 S.Ct. at 572 (in many instances, "allowing nonmutual collateral estoppel against the Government would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"), we see no reasons for denying the government the benefit of the estoppel where its equitable action has been tried jointly with the jury trial of a private plaintiff. Accordingly, the government was entitled to at least a declaratory judgment in its favor.

■ Finally, to the extent that the district court's decision also indicated the view that even if liability were established injunctive relief would not be proper, we conclude that its view represented a misapplication of the law. The court stated, for example, that it considered certain of the requested injunctive relief as "unnecessary since it would be enjoining acts which are already illegal." *Government Suit Opinion,* 839 F.Supp. at 1065. It also indicated that injunctive relief was unwarranted because "if there is any action taken in the future which violates [Orthodox or Hasidic Jews'] rights, the United States Government and other plaintiffs will not be timorous about suing." *Id.* at 1064.

Neither observation was a valid ground for denial of an injunction prohibiting the application of the Airmont zoning code in the discriminatory manner found to be predictable from the evidence in this record. See Part II.A.4. above. The maxim that "equity will not enjoin a crime," 11A C. Wright & A. Miller, *Federal Practice and Procedure,* § 2942, at 70 (2d ed. 1995) (internal quotes omitted), does not hold where Congress has explicitly authorized injunctive relief. *See United States v. Private Sanitation Industry Ass'n,* 995 F.2d 375, 377–78 (2d Cir.1993) (per curiam) (holding that injunction against unlawful act was authorized by statute); 5 *Moore's Federal Practice* ¶ 38.24[3], at 38–208 to 38–214 (2d ed. 1994); Note, *Developments in the Law—Injunctions,* 78 Harv. L.Rev. 994, 1015 (1965). The FHA expressly grants district courts the authority to enter such injunctive relief in a suit by the government against a party who has violated the Act "as is necessary to assure the full enjoyment of the rights granted by [the FHA]." 42 U.S.C. § 3614(d)(1)(A); *see also id.* §§ 3602(i), 3613(a), 3613(c)(1) (private party may bring suit based on a practice that has occurred or is about to occur, and court is authorized to grant injunctive relief in such an action).

The district court did not discuss FHA cases or principles in announcing its view that injunctive relief would be inappropriate. The view that such relief was premature because Airmont had not yet actually applied its zoning provision invidiously was a misap-

plication of the statute. On remand, the district court should, applying Fair Housing Act principles, fashion appropriate equitable remedies.

## CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on these appeals and, except to the extent indicated above, have found them to be without merit. For the reasons stated above, we conclude that the district court erred in granting the Village of Airmont judgment as a matter of law dismissing the private plaintiffs' FHA and civil rights claims; that the jury's verdict with respect to these claims was dispositive with regard to the issue of the Village's liability in the government's suit under the FHA; and that the private plaintiffs and the government were entitled to relief.

We reverse so much of judgment entered in the private plaintiffs' action, appealed in Nos. 94–7103 and –6125, as dismissed the private plaintiffs' claims against the Village; we affirm so much of that judgment as dismissed the private plaintiffs' claims against the individual defendants; and we dismiss the cross-appeal as moot. The private plaintiffs' action is remanded for the entry of judgment awarding those plaintiffs nominal damages and such injunctive and other relief as may be appropriate.

The judgment dismissing the government's action, appealed in No. 94–6048, is reversed, and the matter is remanded for the entry of a declaratory judgment in favor of the government and for such injunctive and other relief as may be appropriate.

Costs to the plaintiff-appellants in each suit.