### EASTAMPTON CENTER, LLC, Plaintiff,

v.

**TOWNSHIP OF EASTAMPTON, in the County of Burlington, a Municipal Corporation of the State of New Jersey, the Township Council of Township of Eastampton, and the Planning Board of Township of Eastampton, Defendants,**

**Daniel M. Tabas and Estate of Charles L. Tabas, a Pennsylvania Partnership trading as Tabas Brothers, Plaintiff,**

v.

**Township of Eastampton, in the County of Burlington, a Municipal Corporation of the State of New Jersey, the Township Council of Township of Eastampton, and the Planning Board of Township of Eastampton, Defendants.**

Nos. CIV.A. 99-CV-1837-JAP, CIV.A 99-CV-1838-JAP.

United States District Court, D. New Jersey.

July 9, 2001.

Thomas F. Carroll, III, Steven M. Eisdorfer, Hill Wallack, Princeton, NJ, for Plaintiffs, Eastampton Center, LLC, Daniel M. Tabas and Estate of Charles L. Tabas.

John E. Harrington, Law Offices of John E. Harrington, Medford, NJ, for Defendants Eastampton Township and the Township Council of Eastampton Township.

Kenneth S. Domzalski, Burlington, NJ, for the Planning Board of Eastampton Township.

## OPINION

PISANO, District Judge:

### I. *Introduction*

In April 1999, Eastampton Center, LLC ("ECLLC"), and Daniel M. Tabas and the Estate of Charles L. Tabas ("Tabas") (together, "Plaintiffs") commenced separate actions against the Township of Eastampton ("Eastampton" or "Township"), the Township Council of Eastampton ("Council"), and the Planning Board of Eastampton ("Planning Board") (together, "Defendants") alleging, *inter alia,* that Eastampton's comprehensive land use amendments to its Master Plan and implementing zoning ordinances ("challenged land use ordinances") discriminate on the basis of familial status in violation of the federal Fair Housing Act, 42 U.S.C. § 3604(a) (1994).

Eastampton is a small community located in Burlington County, New Jersey, which has approximately 6,000 residents. As a result of a comprehensive re-exami-

nation of Eastampton's Master Plan and development regulations, Defendants adopted the challenged land use ordinances, which rezoned and/or downzoned [1] properties located within Eastampton purportedly to provide for open space, to increase the commercial tax base and to control residential growth. Plaintiffs are developers/property owners, whose ability to construct residential developments on their properties was either eliminated or significantly curtailed as a result of the adoption of the challenged land use ordinances. Plaintiffs contend that the challenged land use ordinances violate the Fair Housing Act because their adoption was motivated by an intent to discriminate on the basis of familial status, and reduced the total number of housing units available for families with children in Eastampton. Defendants contend, *inter alia*, that the challenged land use ordinances, which reduce prospective housing construction, do not raise a cognizable claim under the Fair Housing Act, and do not discriminate on the basis of familial status.

The two actions filed by Plaintiffs were subsequently consolidated, and Plaintiffs now jointly move for a partial summary judgment pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56 on count one of both complaints, which asserts a claim under the Fair Housing Act. Defendants oppose Plaintiffs' motion and cross-move for partial summary judgment on the Fair Housing Act claim. This case presents an issue of first impression in this Circuit as to whether a municipality may adopt land use ordinances, which reduce the allowable housing construction within the municipality, to provide for open space, to increase the commercial tax base, and to control residential growth without running afoul of the Fair Housing Act. The Court decides the motion without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons stated below, the Court denies Plaintiffs' motion, and grants Defendants' motion for partial summary judgment on the Fair Housing Act claim.

## II. *FACTUAL BACKGROUND*

### A. *The Parties*

ECLLC is the owner of land located in Eastampton. (Plaintiffs' Statement of Undisputed Facts ("Pls.' Stat."), ¶ 1). ECLLC's property is designated as Block 600, Lots 2, 2.02, and 4 on the tax maps of Eastampton and consists of approximately 210 acres ("ECLLC Property").[2] (Pls.' Stat., ¶¶ 1, 6). Between 1986 and 1997, the ECLLC Property was primarily used as a farm. (Solondz Dep. at 9, attached to Defs.' Certif. as Ex. A). Prior to the adoption of the challenged land use ordinances, the ECLLC Property was located in the Town Center Zone district which allowed for mixed-use development, including residential, business, and quasipublic use. (Pls.' Stat., ¶¶ 6, 7). The residential use allowed for single-family and multi-family housing. "Family" is defined as "one or more persons related by blood, marriage, adoption or guardianship, or any number of persons not so related occupying a dwelling unit and living as a single housekeeping unit." [3]

---

1. Although not defined in the record, the Court understands the term "downzoned" to mean the reduction in the number of housing units which may be constructed within a given area.

2. Although ECLLC was created in early 1998, the principals of ECLLC have maintained an ownership interest in the property since 1986.

(Defendants' Statement of Undisputed Facts ("Defs.' Stat."), ¶ 1; ECLLC Compl., ¶ 8).

3. Although this definition of "family" is taken from one of the challenged land use ordinances, the record does not indicate that the definition of "family" was in any way altered by the new land use ordinances.

(Ordinance 1999-03 at 14, attached to Pls.' Certif. as Ex. K).

Tabas owns undeveloped land in Eastampton, which is designated as Block 1000, Lot 6 on the tax maps and consists of approximately 40 acres ("Tabas Property"). (Pls.' Stat., ¶ 2). Prior to adoption of the land use amendments, the Tabas Property was located in the R-1 Zone district, which permitted the construction of two single-family dwellings per an acre. (Pls.' Stat., ¶ 9).

Eastampton is a municipal corporation organized and existing under the laws of the State of New Jersey. (Pls.' Stat., ¶ 3). The Council is the governing body of Eastampton, and is responsible for enacting land use ordinances, including those challenged in this action. (Pls.' Stat., ¶ 4). The Planning Board was created by the Council pursuant to the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-23 *et seq.*, and is responsible for adopting the comprehensive amendments to the Township's Master Plan. (Pls.' Stat., ¶ 5).

## B. *Eastampton's Referendum on Open Space*

Beginning in 1997, residents of Eastampton expressed their concern about preserving open space. The Council received two petitions, consisting of more than 400 signatures, requesting that the Council (i) deny a development group's request for a zoning variance with respect to "DAC and Axelrad properties" to preserve open space, and (ii) preserve the Tabas Property in its undeveloped state. (Certif. of Richard V. Renzulli ("Renzulli Certif."), ¶ 2, attached to Defs.' Certif. as Ex. F).

In March 1998, Eastampton conducted a survey proposing the establishment of a Municipal Open Space and Farmland Preservation Program (the "Program") to enable Eastampton to participate in such preservation projects in partnership with the County of Burlington and the State of New Jersey. The survey stated that the principle aim of the Program "is to preserve properties which are the subject of possible residential development." (March 1998 Survey Materials attached to Pls.' Certif. as Ex. D). Examples of possible target areas for preservation included the properties specifically identified in the petitions, the DAC property, the Axelrad property, and the Tabas Property. The Tabas Property was described in the survey as "environmentally sensitive land," containing "wetlands and sensitive wildlife." (*Id.*).

The survey enumerated the benefits of the Program as: (i) preserving environmentally sensitive areas; (ii) avoiding the adverse fiscal impact of residential development on future tax rates; and (iii) maintaining the rural character of the community. (*Id.*). It proposed a three cent open space municipal tax, the proceeds of which would be used to purchase land that was slated for residential development. (Pls.' Stat., ¶ 10). Approximately eighty-four percent of the responding citizens approved of the open space municipal tax. (Renzulli Certif., ¶ 4).

In response to the results of the survey, the Council proposed Ordinances 1998-07 and 1998-08 in April 1998, which sought to curtail residential growth in the Town Center Zone and R-1A Zone districts. (Defs.' Stat., ¶ 12). The "Declaration" section of the proposed ordinances identified (i) the residents' desire for the preservation of open space, and (ii) the school system's inability to absorb a potential increase of "school age children," as reasons for decreasing the residential density of Town Center Zone and R-1A Zone districts. (Proposed Ordinances 1998-07 and 1998-08 attached to Pls.' Certif. as Exs. E & F). Ultimately, the proposed ordinances

were withdrawn because the Council recognized that Eastampton's Master Plan had to be amended prior to adopting such downzoning ordinances. (Pls.' Stat., ¶ 16).

In June 1998, the Council sent a letter to its registered voters, asking for their support of the Program in the November 1998 general election ("June 1988 Letter"). (June 1998 Letter attached to Renzulli Certif. as Ex. A). The June 1998 Letter stated that the results of the March 1998 survey "indicate that Eastampton residents recognize the benefits of open space: preservation of our Community's environmental assets while precluding additional fiscal strain on local government in the form of higher school and other public services costs." (*Id.*).

The residents of Eastampton reaffirmed their commitment to an open space municipal tax in the general election, passing the referendum by a margin of seventy-six percent in favor to twenty-four percent against. (Tr. of November 30, 1998 Planning Board Meeting ("November 1998 Tr.") at 28, attached to Defs.' Certif. as Ex. L).

#### C. *Master Plan Amendment*

Pursuant to New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-89, the Council and the Planning Board undertook a comprehensive re-examination of Eastampton's Master Plan and development regulations. (Planning Board Resolution 1999-03 ("Resolution 1999-03") at 1, attached to Defs.' Certif. as Ex. J). The "public sentiment" for open space was identified by the Planning Board as the "driving incentive" for the Master Plan re-examination process. (Tr. of October 14, 1998 Planning Board Meeting ("October 1998 Tr.") at 13-15, attached to Defs.' Certif. as Ex. K).

4. Plaintiffs and their representatives attended and participated in several of these meetings.

Public meetings were held on September 16, October 7, October 14, October 21, and October 28, 1998, along with nine separate Planning Board hearings. (Defs.' Stat., ¶¶ 17-18).

During the series of Planning Board hearings, the Planner for Eastampton Township, Peter P. Karabashian Associates, Inc., P.P., presented its reports and recommendations outlining the proposed amendments to the Master Plan ("Master Plan Re-examination Report").[4] (Resolution 1999-03 at 3). The Master Plan Re-examination Report consisted of several discrete parts, including (i) Statement of Goals and Objectives; (ii) Land Use Element; (iii) Housing Plan Element; (iv) Recycling Element; and (v) Relationship of Master Plan Elements to Master Plans of Contiguous Municipalities, Burlington County, and the State Development and Redevelopment Plan. (Master Plan Re-examination Report attached to Pls.' Certif. as Ex. I).

The goals identified by the Master Plan Re-examination Report included: (i) conservation of natural resources and systems; (ii) preservation and enhancement of the historic, cultural, scenic, open space and recreational values in the Township; (iii) promotion of beneficial economic growth and development; (iv) protection of environment; (v) provision of adequate facilities and services; and (vi) provision of adequate affordable housing. (November 1998 Tr. at 24). Moreover, the Master Plan Re-examination Report was developed in relation to Burlington County's Farmland and Open Space Preservation Program, the State Development and Redevelopment Plan, and surrounding municipalities' master plans. (*Id.* at 26-27, 54-64).

(Defs.' Stat., ¶ 17).

The Land Use Element of the Master Plan Re-examination Report noted that historically development in Eastampton had been concentrated in the center of the municipality, with the surrounding areas characterized by lower density agricultural or open space uses. (Master Plan Re-examination Report at LU-4). Pursuant to the stated goals and existing patterns of development in Eastampton, the Master Plan Re-examination Report proposed (i) the downzoning of environmentally sensitive areas; (ii) the creation of low density business park districts; and (iii) the designation of an area for low and moderate income housing. (*Id.* at LU-14). The proposed land use amendments were intended to create a "green belt" around the municipality's center to preserve "the historic open space and environmentally-sensitive areas of the community." (November 1998 Tr. at 24).

The Housing Element of the Master Plan Re-examination Report stated that the adoption of zoning regulations consistent with the Land Use Element would allow for the future development of 193 to 443 new housing units, 100 of which would be set aside as low or moderate income housing as required by a court order. (Master Plan Re-examination Report at H-6). Since 1960, the population in Eastampton had increased approximately four-fold. (*Id.* at H-9). Under the existing zoning ordinances, there was a potential for the development of 1815 to 2161 additional housing units, which, if built to the maximum allowable, was anticipated to double Eastampton's population of 5,985 residents. (November 1998 Tr. at 32). The Master Plan Reexamination Report stated that "[t]his continued high level of growth in population increases the potential impacts on facilities such as local schools, which are already at or near capacity, utilities, roads, open space, etc." (Master Plan Re-examination Report at H-6).

The Master Plan re-examination process was intended not only to preserve open space but also to increase the commercial tax base and to control residential growth. (Defs.' Stat., ¶ 10). During several Planning Board hearings, Planning Board and Council members expressed their concern about the impact of a "sprawl development" on Eastampton's infrastructure. (October 1998 Tr. at 37). Goal three of the Master Plan Re Examination Report addressed their concern. One of the stated objectives of goal three is to "achieve a balance in the municipal tax base by providing for expanded business and commercial uses to offset the current residential imbalance." (Master Plan Re-examination Report at G & O-2).

The Master Plan Re Examination Report was approved by the Planning Board on December 23, 1998, and formally adopted as the Master Plan Amendment pursuant to Planning Board Resolution 1999-03. (Defs.' Stat., ¶ 22). In adopting the Master Plan Amendment, the Planning Board stated that it was acting in conformity with the New Jersey Municipal Land Use Act. (Resolution 1999-03 at 5).

### D. *Ordinances 1999-03 and 1999-04*

To implement the recommendations of the Master Plan Amendment, Ordinances 1999-03 and 1999-04 were introduced and ultimately adopted on March 8, 1999. These ordinances established new zoning districts and standards for properties located in Eastampton. (Defs.' Stat., ¶¶ 25, 26). Ordinance 1999-03 created new categories of zoning districts, and designated residential zoning districts as either low, medium, or high density. (Ordinance 1999-03 attached to Pls.' Certif. as Ex. K). Ordinance 1999-04 changed the zoning designations of properties located in Eastampton. (Pls.' Stat., ¶ 26).

As a result of these implementing ordinances, fifteen districts were rezoned, with several districts specifically downzoned from a density of two residential units per an acre to a low density of one unit per five acres. (Ordinances 1999-03 & 1999-04). ECLLC Property could no longer be used for residential development, but was designated as a viable site for business park and recreational uses. (Pls.' Stat., ¶ 27). The Tabas Property was designated for open space and provided for the construction of approximately five homes. (*Id.*). In addition, Ordinance 1999-03 provided that on or after the effective date of the regulation, "no land or building shall be used, developed, constructed, located, altered, rebuilt or enlarged for any purpose within the Township of Eastampton except in conformity with the restrictions and regulations established by this Chapter." (Ordinance 1999-03).

### E. *Plaintiffs' Residential Development Applications*

ECLLC prepared and filed its first and only application for general development plan with the Planning Board in September 1998. (Pls.' Stat., ¶ 8). ECLLC's application sought approval for the residential development of 577 housing units which would have resulted in a twenty-five percent increase of the total housing stock in Eastampton. (Defs.' Stat., ¶ 8). On October 14, 1998, ECLLC was informed that the application was incomplete pursuant to the requirements of the Municipal Land Use Law. *Eastampton Center, LLC v. Planning Bd. of the Township of Eastampton,* Docket No. BUR-L-631-99, slip op. at 2, (N.J.Super.Ct. March 13, 2000). After ECLLC produced the requested materials, Eastampton waited until December 16, 1998 to act on the application, declaring it

incomplete. (*Id.* at 3). In litigation before the Superior Court of New Jersey, however, the application was deemed complete because Eastampton had failed to act within 45 days after the application was completed as required by N.J.S.A. 40:55D-10.3.[5] (*Id.* at 6). Although the state court has granted ECLLC's application default approval, Ordinance 1999-03 still prohibits land uses that do not conform with the Master Plan Amendment.

Tabas also filed a development plan application, which was deemed complete on March 17, 1999. After two public hearings on the application, it was denied because the development plan did not conform to the new residential low density zoning standard for that district.[6] (Planning Board Resolution 1999-09, ¶¶ 7-9, attached to Defs.' Certif. as Ex. E). Currently, the Council is actively pursuing the acquisition of the Tabas Property pursuant to various municipal, county and state programs for preservation of open space. (Defs.' Stat., ¶ 23).

### III. *Summary Judgment Standard*

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court's task is to determine whether disputed issues of material fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts in the light most favorable

---

5. Defendants are currently appealing this decision. (Defs.' Stat., ¶ 30).

6. Tabas did not appeal this decision. (Defs.' Stat., ¶ 9).

to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176-177 (3d Cir.1997). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Thus, the non-moving party may not rest upon the mere allegations or denials of its pleadings. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

Once the moving-party has demonstrated to the court the absence of a material fact at issue, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348 (citations omitted). In other words, "[i]f the evidence [submitted by the non-moving party] is merely colorable ... or is not significantly probative ... summary judgment may be granted."

*Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

The Supreme Court has specifically recognized that:

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and ... that [the rule] should be interpreted in a way that allows it to accomplish this purpose.

*Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. Thus, "[w]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment *must* be entered for the moving party." *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 341 (3d Cir.1990) (emphasis in original); *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) (same).

## IV. *DISCUSSION*

### A. *Overview of the Fair Housing Act*

Congress enacted the Fair Housing Act as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3631 (1994), to prohibit housing discrimination on the basis of race, color, religion or national origin. Subsequently, the Fair Housing Amendments Act of 1988 extended the protected classes to include "familial status." *United States v. Branella*, 972 F.Supp. 294, 297-98 (D.N.J.1997). Familial status is defined as one or more persons under the age of 18 domiciled with a parent or legal custodian. 42 U.S.C. § 3602(k). Plaintiffs rely on the following provision of the Fair Housing Act which, as amended, makes it unlawful:

[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race,

color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a)(emphasis added).

█ A violation of the Fair Housing Act may be established by showing that the challenged actions were either (i) motivated by intentional discrimination or (ii) resulted in a discriminatory effect, even absent evidence of a discriminatory motive.[7] *Doe v. City of Butler, Pennsylvania,* 892 F.2d 315, 323 (3d Cir.1989); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 142 (3d Cir.1977) (same); *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995) (same). Plaintiffs seek to demonstrate a violation of the Fair Housing Act under the intentional discrimination prong.

█ Under the first theory, a plaintiff can establish a *prima facie* case of intentional discrimination by showing that discriminatory intent against a protected group was a motivating factor for the challenged action. *LeBlanc–Sternberg,* 67 F.3d at 425. Determining "whether invidious discriminatory purpose was a *motivating factor* demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)(emphasis added)("*Arlington Heights I*"); *see also Branella,* 972 F.Supp. at 298 (requiring a plaintiff to show that familial status was a motivating factor in the alleged discriminatory action). To find discriminatory intent, the following factors are considered: (i) discriminatory impact of the challenged practice or policy; (ii) the historical background of the challenged decision; (iii) the "sequence of events leading up to the challenged decision;" (iv) departures from "normal proce-

dural sequences;" (v) departures from normal substantive criteria; and (vi) legislative or administrative history of the challenged decision. *Rizzo,* 564 F.2d at 142 n. 22 (citing *Arlington Heights I,* 429 U.S. at 265, 97 S.Ct. 555).

█ To establish liability under the discriminatory effect theory, a plaintiff must establish a *prima facie* case that the challenged action has a discriminatory effect on a protected class. *Rizzo,* 564 F.2d at 148; *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 937 (2d Cir.) (discriminatory effect can be proven by showing either an adverse impact on a particular protected class or harm to the community in general due to the perpetuation of segregation) (citation omitted), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). While a plaintiff is not required to show that the defendant was motivated by discriminatory animus to establish a *prima facie* case of discriminatory effect, every action that results in a discriminatory effect is not illegal. *Metro. Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977)("*Arlington Heights II*").

█ Once a plaintiff has established a *prima facie* case of discriminatory effect, a court must determine whether a defendant can justify its challenged conduct. *Rizzo,* 564 F.2d at 148. A defendant must establish that the stated justifications serve "in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and ... that no alternative course of action could be adopted that would enable that interest to be served with less discrimina-

---

**7.** A violation of the Fair Housing Act can also be established if a challenged practice or ordinance discriminates against protected class members on its face and serves no legitimate

governmental interest. *Horizon House Developmental Servs. v. Township of Upper Southampton,* 804 F.Supp. 683, 693 (E.D.Pa.1992), *aff'd,* 995 F.2d 217 (3d Cir.1993).

tory impact." *Id.* at 149.[8] If the defendant fails to provide a legitimate justification, a violation under the Fair Housing Act is proven. If, however, the defendant produces evidence that no alternative course of action can be adopted in its pursuit of a bona fide interest, the plaintiff bears the burden of demonstrating that other practices are available. *Burney v. Hous. Auth. of the County of Beaver,* 551 F.Supp. 746, 770 (W.D.Pa.1982).

## B. *Standing Under the Fair Housing Act*

■ Plaintiffs assert in a conclusory fashion that their standing to sue under the Fair Housing Act "cannot be questioned." (Pls.' Br. at 5). Plaintiffs claim that they qualify as an "aggrieved person" under the Fair Housing Act, and therefore may bring a private action against Defendants for allegedly discriminating against families with children. Although Defendants do not specifically state that Plaintiffs lack standing, they maintain that Plaintiffs only represent the economic interests of a developer and that the Fair Housing Act does not provide a private right of action to such plaintiffs. (Defs.' Surreply Br. at 2; Defs.' Br. at 10). Federal courts are required to conduct an independent judicial inquiry into their own jurisdiction. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Thus, even if the parties fail to raise the issue of standing, it may be addressed by the court *sua sponte* at any stage of the proceedings. *Id.* at 230, 110 S.Ct. 596.

As a general matter, "the question of standing is whether the litigant is entitled to have the Court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Constitutional limitations on standing are derived from the case or controversy requirement embodied in Article III of the Federal Constitution. The Supreme Court has reasoned that "the essence of the standing question, in its constitutional dimension, is whether the plaintiff has alleged such a personal stake in the outcome of the controversy [as] to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Arlington Heights I,* 429 U.S. at 260–61, 97 S.Ct. 555 (citations omitted).

To satisfy the Article III standing requirement, a party must meet a three-prong test. First, a plaintiff must demonstrate that it has suffered a concrete, particularized, actual or imminent injury in fact. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Both economic injury and non-economic injury to a plaintiff is sufficient. *Arlington Heights I,* 429 U.S. at 262–263, 97 S.Ct. 555. The second prong is the traceability or causation requirement. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. A plaintiff must illustrate a causal connection between the alleged injury and defendants' challenged conduct. *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers,* 141 F.3d 71, 74 (3d Cir.1998)(citation omitted). Lastly, the third prong requires a plaintiff to show that the alleged injury will likely be redressed by a favorable

---

8. While the Eighth Circuit has required defendants to show a "compelling interest" to justify a discriminatory effect, the Third Circuit has specifically declined to extend an equal protection analysis to a Fair Housing Act disparate impact claim. *Compare Rizzo,* 564 F.2d at 148 *and United States v. City Of Black Jack, Missouri,* 508 F.2d 1179, 1185 (8th Cir.1974) (en banc)(once plaintiff establishes a racially discriminatory effect, the burden shifts to the defendant to demonstrate a compelling governmental interest).

decision. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. The redressability requirement ensures that legal questions presented to the court will be resolved in a concrete manner, and that they demonstrate a real need for a court to exercise its power. *Warth,* 422 U.S. at 508, 95 S.Ct. 2197 (citation omitted).

Concerned about the proper and "properly limited" role of the federal courts, the federal judiciary has also adopted self-imposed prudential limitations on standing.[9] *Fair Hous. Council,* 141 F.3d at 74 (citation omitted). In *Warth v. Seldin,* the Supreme Court summarized the additional prudential concerns:

> Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers. First, the Court has held that when the asserted harm is a 'generalized grievance' ... that harm alone normally does not warrant exercise of jurisdiction.... Second, even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, *this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.*

*Warth,* 422 U.S. at 499, 95 S.Ct. 2197 (citations omitted)(emphasis added).

■ Because of the well-established rule disfavoring plaintiffs that assert third-party standing, the Third Circuit has concluded that before allowing such suits to proceed, the district court must consider (i) the relationship between the plaintiff and the third-party, (ii) the ability of the thirdparty to advance its own rights, and (iii) the impact on the third-party interest.[10] *Amato v. Wilentz,* 952 F.2d 742, 749 (3d Cir.1991).

### 1. *Standing Required Under the Fair Housing Act*

Under the Fair Housing Act, an "aggrieved person" may commence a civil action to obtain relief from an alleged discriminatory housing practice. 42 U.S.C. § 3613(a). The Fair Housing Act defines an aggrieved person to include any person who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). The Supreme Court has broadly construed the standing requirements under the Fair Housing Act, ruling that the "sole requirement" is the Article III criteria. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

In *Trafficante,* the Supreme Court reasoned that courts should give standing under the Fair Housing Act a "generous construction," thereby allowing non-protected class members who reside in the same residential area and are similarly injured by racial discrimination standing to sue. *Trafficante,* 409 U.S. at 212, 93 S.Ct. 364. Ten years later, the Supreme Court in

---

**9.** Because prudential considerations are not mandated by the Constitution, Congress may abrogate such limitations, and grant a right of action to persons who otherwise would be barred. *Warth,* 422 U.S. at 501, 95 S.Ct. 2197.

**10.** Since standing is an indispensable part of the plaintiff's case, the party invoking federal jurisdiction must establish these requirements in the same manner as all other matters on which the plaintiff carries the burden of proof. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. Thus, the burden is on the plaintiff to demonstrate third-party standing. *Amato,* 952 F.2d at 750.

*Havens* bolstered the liberal reading of standing advanced in *Trafficante* by stating that "[a]s long as respondents have alleged distinct and palpable injuries that are 'fairly traceable' to petitioners' actions, the Art[icle] III requirement of injury in fact is satisfied." *Havens*, 455 U.S. at 376, 102 S.Ct. 1114 (citation omitted); *LeBlanc-Sternberg*, 67 F.3d at 424 (same).

The Supreme Court has specifically held that a plaintiff need not be a member of a protected class to bring suit under the Fair Housing Act, so long as the plaintiff suffered an actual injury due to defendant's alleged discriminatory conduct. *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). In *Gladstone*, the Supreme Court extended standing to a village and area residents who acted as "testers" in an attempt to determine whether real estate brokerage firms were engaged in racial "steering" by directing potential home buyers interested in equivalent properties to different residential areas based on their race. *Id.* at 93–94, 99 S.Ct. 1601. The Supreme Court ruled that, although the plaintiffs in their capacity as "testers" lacked standing, they were entitled to sue as area residents under the Fair Housing Act for the deprivation of the "social and professional benefits of living in an integrated community." *Id.* at 97–98, 99 S.Ct. 1601. While plaintiffs were not the targets of discrimination, the Supreme Court ruled that they still suffered a distinct and palpable injury as a result of racial animus. *Id.* at 114–15, 99 S.Ct. 1601; *Havens*, 455 U.S. at 376–78, 102 S.Ct. 1114 (same); *Trafficante*, 409 U.S. at 208–09, 93 S.Ct. 364 (same).

Relying on the Supreme Court's broad construction of standing under the Fair Housing Act, the Third Circuit has held that standing will be conferred where a non-protected class member's plans to develop housing for a protected class member are thwarted by an allegedly discriminatory practice. *See Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1100 n. 2 (3d Cir.1996)(citations omitted); *Growth Horizons, Inc. v. Delaware County, Pennsylvania*, 983 F.2d 1277, 1282 (3d Cir. 1993). In *Growth Horizons*, the Third Circuit concluded that a corporation which provided residential placements for mentally disabled individuals had standing to sue under the Fair Housing Act because the corporation alleged that it suffered economic injury as a result of discriminatory animus towards disabled people. *Growth Horizons*, 983 F.2d at 1282. Likewise, in *Hovsons* a nursing home developer was granted standing to raise claims on behalf of unidentified plaintiffs who would have resided in the proposed facility. *Hovsons*, 89 F.3d at 1100 n. 2; [11] *see also Kessler Inst. for Rehabilitation, Inc. v. Mayor and Council of Essex Fells*, 876 F.Supp. 641, 651-52 (D.N.J.1995)(holding that property owners have standing under the Fair Housing Act when their properties are directly targeted by an alleged discriminatory housing practice against protected class members).

**11.** The Court acknowledges that the Fair Housing Act expressly states that any person "associated with" a handicapped buyer or renter has standing to challenge regulations which allegedly discriminate against handicapped class members. 42 U.S.C. § 3604(f)(1). The Third Circuit, however, has concluded that this specific provision does not limit who may pursue an action under the Fair Housing Act. *Growth Horizons*, 983 F.2d at 1282 n. 7. Following the broad construction of standing advanced in *Trafficante, Gladstone,* and *Havens,* the Third Circuit has interpreted the Fair Housing Act to confer standing where there is direct injury sustained as a result of alleged discriminatory housing practices. *Id.*

### 2. Plaintiffs Have Standing Under the Fair Housing Act

■ Given the broad construction established by the Supreme Court and Third Circuit, Plaintiffs' allegations meet the standing requirements under the Fair Housing Act.[12] Plaintiffs are non-protected class members whose plans to develop residential housing were thwarted by Eastampton's alleged discrimination against families with children. According to the Third Circuit cases, Plaintiffs' inability to build residential developments due to the Township's revised zoning ordinances, is an economic injury that constitutes an injury in fact for standing purposes. See Growth Horizons, 983 F.2d at 1282; Hovsons, 89 F.3d at 1100; see also Baytree of Inverrary Realty Partners v. City of Lauderhill, 873 F.2d 1407, 1408-09 (11th Cir.1989) (holding that a real estate developer, whose financing was approved on the condition that twenty percent of apartment units be set aside as low or moderate income housing, had standing under the Fair Housing Act because the developer's injury allegedly resulted from racial animus).

Further, Plaintiffs' economic injury is fairly traceable to Defendants' adoption of new zoning ordinances allegedly motivated by an intent to exclude or reduce housing options available to families with children. This causal connection is sufficient to satisfy the second prong of constitutional standing. See generally, Havens, 455 U.S. at 376, 102 S.Ct. 1114. Finally, if Plaintiffs are granted the relief they seek, their development plans will no longer be deemed nonconforming to Eastampton's land use ordinances. A court decision in Plaintiffs' favor would remedy their economic injury, establishing the final redressability requirement. Therefore, the Court finds that these allegations are sufficient to confer standing under the Fair Housing Act.[13]

## C. Fair Housing Act Claim

Plaintiffs argue that they are entitled to summary judgment because the adoption of the Master Plan Amendment and implementing Ordinances 1999-03 and 1999-04 "were unquestionably motivated by an intention to exclude families with children" from Eastampton "for fiscal reasons." (Pls.' Br. at 3). Plaintiffs further contend that the changed land use ordinances, which curtailed residential growth, violate the Fair Housing Act by "reducing the

12. In deciding the standing issue, the Court is mindful that an inquiry into standing cannot collapse into an inquiry on the merits. See generally, Warth, 422 U.S. at 498, 95 S.Ct. 2197; Franklin Bldg. Corp. v. City of Ocean City, 946 F.Supp. 1161, 1166 (D.N.J.1996) (a court cannot transform a standing inquiry into a decision on the merits).

13. In finding standing, the Court notes several differences between the Supreme Court decisions which broadly construed the standing requirements to promote the purpose of the Fair Housing Act and the present case. A primary purpose behind the Fair Housing Act is to prevent discriminatory racial animus in housing practices, and to promote the important goal of "stable, racially integrated housing." Gladstone, 441 U.S. at 111, 99 S.Ct. 1601 (citation omitted). Given the circumstances present in Gladstone, Havens, and Trafficante, conferring standing on those plaintiffs undoubtedly promoted the interests protected by the Fair Housing Act. In the present action, there is no evidence of segregated housing patterns based on familial status in Eastampton Township. Moreover, plaintiffs in Hovsons and Growth Horizons were building housing specifically for protected class members. In contrast, the record here does not indicate that Plaintiffs' development plans were intended specifically to benefit families with children or any other protected class. Notwithstanding these distinctions, the Court is constrained to confer standing under the Fair Housing Act given the broad reading adopted by the Supreme Court and Third Circuit.

housing choices available in Eastampton to families with children." (*Id.*). Defendants argue that they are entitled to summary judgment because the Fair Housing Act only applies to specific restrictive practices in existing housing. (Defs.' Br. at 10). They further contend that the land use ordinances do not discriminate on the basis of familial status, and that invalidating such ordinances under the facts of this case would prevent a municipality from ever rezoning or downzoning properties located within the municipality to promote legitimate purposes of land use planning.[14] (Defs.' Surreply Br. at 4-5).

### 1. *Statutory construction of the Fair Housing Act*

The purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Congress amended the Fair Housing Act to cover families with children to eradicate restrictive housing practices which deny housing on the basis of familial status. This expansion of coverage was supported by a Congressional finding that "[i]n many parts of the country families with children are refused housing despite their ability to pay for it." [15] H.R. Rep. No. 100-711, at 19 (1988) *reprinted in* U.S.C.C.A.N. 2173, 2180. Congress relied on studies by the Department of Housing and Urban Development ("HUD") which "found that 25 percent of all rental units did not allow children; 50 percent were subject to restrictive policies that limited the ability of families to live in those units; and almost 20 percent of families were living in homes they considered less desirable because of restrictive practices." [16] *Id.*

14. Defendants also suggest that their compliance with a court ordered judgment pursuant to *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel*, 92 N.J. 158, 456 A.2d 390 (1983)("*Mount Laurel II*"), by providing for the construction of 100 units of low or moderate income housing in the Master Plan Amendment, creates an immunity under the Fair Housing Act. (Defs.' Br. at 14). *Mount Laurel II* only requires municipalities "to provide realistic opportunities for the construction of low and moderate income housing." *Mount Laurel II*, 92 N.J. at 200-01, 456 A.2d 390. Satisfying *Mount Laurel II* does not necessarily exempt a municipality from suits under the Fair Housing Act, which broadly prohibits restrictive practices in housing on the basis of race, color, sex, religion, national origin, handicap and familial status.

15. Defendants also argue that the Fair Housing Act does not apply to the facts presented because they have "done nothing to discriminate against the true victims of discrimination the [Fair Housing] Act was designed to protect: single-parent families, young families and poor families with children." (Defs.' Br. at 12-13). Although courts have noted that "Congress expanded the Fair Housing Act to protect familial status discrimination in light of an express concern for the plight of single-parent families, young families with children, and poor families," *Branella*, 972 F.Supp. at 297 (citing *United States v. Lepore*, 816 F.Supp. 1011, 1017 (M.D.Pa.1991))(quoting 134 Cong.Rec. H4611 (daily ed. June 22, 1988) (statement of Rep. Miller)), these cases do not stand for the proposition that the Fair Housing Act's protection is limited to this particular group. The express language of the Fair Housing Act, which expands coverage on the basis of familial status without qualification, as well as its legislative history, indicates that Congress intended to eliminate restrictive housing practices directed against all families with children.

16. Congress further noted that 99 percent of the respondents to HUD's national survey on restrictive rental practices reported numerous complaints relating to housing discrimination against children. H.R. Rep. No. 100-711, at 19. Specifically, "[o]f these respondents, 55 percent had searched for housing for over 9 weeks; 47 percent reported living in substandard conditions; 22 percent had been forced to move; 39 percent lived in overcrowded conditions; and 19 percent said that family members had to live apart during the past year." *Id.*

Section 3604(a), which Plaintiffs rely upon, prohibits not only the refusal to sell or rent a dwelling, but also forbids all practices that "otherwise make unavailable or deny" housing to any person on the basis of familial status. The Fair Housing Act has been interpreted to prohibit municipalities from exercising their police powers to enact land use ordinances in a discriminatory manner. *See LeBlanc-Sternberg,* 67 F.3d at 424 ("The phrase 'otherwise make unavailable or deny' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions."); *United States v. Borough of Audubon, New Jersey,* 797 F.Supp. 353, 360 (D.N.J.1991)(same)(citations omitted); *United States v. City of Parma, Ohio,* 494 F.Supp. 1049, 1096-99 (N.D.Ohio) (same), *aff'd,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). "[A]lthough a municipality has a legitimate governmental interest in regulating land use, [federal courts] have a duty under the [Fair Housing] Act to ensure that that interest is effectuated in a non-discriminatory manner." *Audubon,* 797 F.Supp. at 360.

### 2. *Applicability of the Fair Housing Act*

Initially, the Court must reject Defendants' broad contention that the Fair Housing Act only applies to specific restrictive practices in existing housing and not to land use ordinances of general applicability to prospective residential developments. *See Huntington,* 844 F.2d at 937–38 (invalidating a municipality's zoning ordinance which confined private construction of multi-family housing to a narrow urban renewal area largely populated by minorities); *Black Jack,* 508 F.2d at 1184–88 (invalidating a municipality's zoning ordinance which prohibited construction of multi-family housing); *Arlington Heights II,* 558 F.2d at 1285 (same); *Parma,* 494 F.Supp. at 1096–99 (invalidating a municipality's zoning ordinance which imposed height, parking, and voter-limitations on future housing developments).

The case relied on by Plaintiffs, *United States v. City of Parma, Ohio,* is instructive. In *Parma,* the government commenced an action against Parma contending that the township "has had, and continues to follow, a long standing policy of excluding blacks from taking up residence in any substantial numbers." *Parma,* 494 F.Supp. at 1051-52. Although Parma's population exceeded 100,000 people, statistics demonstrated that Parma was well over 99.5% white, while adjacent Cleveland was 38% minority. *Id.* at 1052. Included among Parma's list of alleged discriminatory actions were (i) Parma's constant opposition to all forms of public and low-income housing, despite the obvious need for low income housing within Parma and its surrounding cities; and (ii) Parma's adoption and application of land use ordinances which imposed height, parking and voter-approval limitations on future housing developments. *Id.* The court concluded that Parma's opposition to any form of public or low income housing was based on racial animus and resulted in a segregative effect on a virtually all-white city. *Id.* at 1072-74. Further, the court concluded that the purpose of Parma's zoning ordinances, which imposed a 35 feet height limitation and voter approval on all future residential development, "was to exclude blacks from residing in Parma and to maintain the segregated 'character' of the City." *Id.* at 1096. The court stated that "Parma's all-white composition was created by pervasive acts of purposeful discrimination, and was preserved by a series of discriminatory actions taken by the City." *Id.* at 1097.

In *Parma* and the cases noted above, the courts broadly construed the text of the Fair Housing Act to strike down a municipality's zoning ordinances which *precluded* the construction of integrated, multi-family housing development because the restrictive regulations either *segregated* African-Americans within the municipality or *excluded* them from residing in the municipality. *Parma*, 494 F.Supp. at 1096 (the challenged zoning ordinances maintain the city's segregated "character"); *Huntington*, 844 F.2d at 928 (the "overwhelmingly white suburb's zoning regulation" which resulted in a disproportionate harm to African Americans and segregative impact on the rest of the municipality violated the Fair Housing Act); *Arlington Heights II*, 558 F.2d at 1286–87 (failure to rezone perpetuates racial segregation); *Black Jack*, 508 F.2d at 1186 (exclusion of multi-family housing perpetuates segregation). In striking down these restrictive land use regulations on prospective housing developments, the courts sought to further the express Congressional policy of achieving integrated living patterns. *Huntington*, 844 F.2d at 935 (the Fair Housing Act "must be construed expansively to implement" the goal of integration) (citing *Trafficante*, 409 U.S. at 211–12, 93 S.Ct. 364); *Black Jack*, 508 F.2d at 1184 ("The discretion of local zoning officials ... must be curbed where the clear result of such discretion is the segregation of low-income Blacks from all White neighborhoods.") (citation omitted); *Arlington Heights II*, 558 F.2d at 1283 (recognizing a statutory obligation under the Fair Housing Act "to refrain from zoning policies that effectively foreclose the construction of any low-cost housing within its corporate boundaries").

 Although the Court rejects Defendants' broad contention, the Court agrees with Defendants that the cases noted above are distinguishable from the circumstances of this case. Whereas the land use ordinances in *Huntington*, *Arlington Heights II*, *Black Jack*, and *Parma* discriminated against African-Americans and perpetuated segregated living patterns by foreclosing the construction of multi-family housing developments, the Master Plan Amendment and its implementing ordinances do not discriminate on the basis of familial status. Admittedly, the challenged land use ordinances control residential growth; they, however, neither preclude families with children from existing housing nor foreclose future development of housing for this protected group in Eastampton. Plaintiffs do not contend that the challenged land use ordinances in any way restrict families with children from residing in housing units located in Eastampton. Rather, families with children remain eligible to own, purchase or otherwise occupy existing housing units located in Eastampton. Although the challenged land use ordinances no longer allow construction of residential developments on the ECLLC Property, they provide for the construction of 442 new housing units, including multi-family and single-family housing, elsewhere in the Township. Based on these undisputed facts, the Master Plan Amendment and its implementing ordinances do not otherwise make unavailable or deny housing based upon familial status.

Plaintiffs erroneously claim that the Master Plan Amendment and its implementing ordinances violate the Fair Housing Act because they can no longer develop their properties as they see fit. (Pls.' Br. at 14-15). Plaintiffs' argument is as follows: (i) ECLLC was planning to construct 577 single-family homes; (ii) based upon the most recent United States Census each single-family home generates between .82 and 1.5 students per home; and (iii) as a result of the implementing ordinances, between 473 to 865 school-aged

children who would have resided in their 577 residential units are now excluded from Eastampton. (Pls.' Br. at 15). The Court agrees with Defendants that accepting Plaintiffs' argument would categorically preclude any municipality from ever rezoning or downzoning properties, which has the effect of reducing allowable residential construction. Land use regulations, by their nature, are restrictive since they allow for certain uses and preclude others. Plaintiffs' argument merely demonstrates that the challenged land use ordinances are restrictive--not that they are discriminatory. Plaintiffs have failed to provide any case law support for the proposition that land use ordinances which merely reduce the allowable residential construction are *per se* discriminatory under the Fair Housing Act. Plaintiffs' expansive reading of the Fair Housing Act would indeed prevent a municipality from engaging in legitimate land use planning to control the rate and character of its development.

 As a general matter, the Fair Housing Act does not impose any affirmative duty upon a municipality to plan for, promote, or construct any type of housing. *Acevedo v. Nassau County, New York,* 500 F.2d 1078, 1082 (2d Cir.1974). Unless done in a discriminatory manner, municipalities may control residential growth to promote the public good pursuant to the police powers delegated to it by the state. *See generally, Pace Res., Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1030 (3d Cir.)(stating that zoning ordinances which allegedly "prevent change, keep other citizens out of the Township, . . . minimize Township services and expenditures, . . . keep taxes down" promoted the public good), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987); *Agins v. City of Tiburon,* 447 U.S. 255, 262, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)(stating that open space zoning ordinances served the public by

"assuring careful and orderly development of residential property with provision for open-space areas"); *Construction Indus. Ass'n of Sonoma County v. City of Petaluma,* 522 F.2d 897, 908–09 (9th Cir.1975) (holding that a municipality's plan to fix the housing development growth rate "to preserve its small town character, its open spaces and low density of population" was a valid exercise of its police powers).

The Third Circuit has recognized that "[c]ontrolling the rate and character of community growth is the very objective of land use planning." *Pace Res.,* 808 F.2d at 1030. Moreover, New Jersey Municipal Land Use Law specifically identifies the goals of land use ordinances to include:

a. To encourage municipal action to guide the appropriate use or development of all lands in this State . . .

\*　　\*　　\*　　\*　　\*　　\*

c. To provide adequate light, air and open space;

\*　　\*　　\*　　\*　　\*　　\*

g. To provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial use and open space . . .

\*　　\*　　\*　　\*　　\*　　\*

j. To promote the conservation of historic sites and districts, open space, energy resources and valuable natural resources in the State and to prevent urban sprawl and degradation of the environment through improper use of land;

k. To encourage planned unit developments which incorporate the best features of design and relate the type, design and layout of residential, commercial, industrial and recreational development to the particular site . . .

(N.J.S.A.40:55D-2). Defendants were specifically seeking to advance the goals of

land use planning identified by the New Jersey legislature in adopting the Master Plan Amendment.

The Court is also mindful that "[l]and use policy customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong." *Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3d Cir.1988); *see also Pace Res.*, 808 F.2d at 1036 ("A federal court, after all, 'should not . . . sit as a zoning board of appeals.' ") (citation omitted); *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 719 F.Supp. 75, 81 (D.R.I.1989) ("[I]t is not the Court's function to act as a 'super zoning board' substituting its judgment for that of a democratically elected body on debatable issues of land use policy.")(citing *Raskiewicz v. Town of New Boston*, 754 F.2d 38, 44 (1st Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985)).

Significantly, the State of New Jersey has adopted a development plan, a major goal of which "is to halt suburban sprawl, [which is] characterized as a 'pattern of development that destroys the character of the cultural landscape, is inefficient in terms of public facilities and services and devoid of the sense of place that has long defined the character of life in New Jersey.' " *Mount Olive Complex v. Mount Olive Vill. Sewer Co.*, 774 A.2d 704, 340 N.J.Super. 511, 541, 774 A.2d 704, 722 (2001). In adopting the Master Plan Amendment, Defendants sought to preserve the rural character of the community and prevent suburban sprawl. Where a municipality adopts comprehensive land use ordinances in relation to a state development plan, as here, the tenets of federalism are particularly strong.

■ Plaintiffs seek to have the Court interfere with a municipality's legitimate interest in controlling the rate and character of its growth where no clear purpose of the Fair Housing Act would be advanced by such an intrusion. Plaintiffs, here, were not seeking to construct residential developments specifically to benefit families with children or to promote the express Congressional policy of achieving integrated living patterns. Plaintiffs have not presented any evidence which suggests that there is a housing shortage for families with children in Eastampton or that any protected class member even expressed an interest in occupying their proposed residential developments. "A landowner is not entitled to have his land zoned for its highest and most advantageous economic use" under New Jersey land use law. *Sporkin v. Stafford Township*, 227 N.J.Super. 569, 548 A.2d 218, 219 (1988). Nor is a municipality "obliged . . . to allow for the maximum density of construction that environmental factors will permit." *Mount Laurel II*, 92 N.J. at 315, 456 A.2d 390. In short, Plaintiffs' interest in maximizing the value of their property "in no way implicates values protected by [the Fair Housing] Act." *Nasser v. City of Homewood*, 671 F.2d 432, 437 (11th Cir.1982).

■ In sum, the Master Plan Amendment and its implementing ordinances do not impose restrictions that otherwise make unavailable or deny housing on the basis of familial status. New Jersey Supreme Court's statements in *Mount Laurel II* about the requirements of the state constitution on a municipality's land use planning are equally applicable to the Fair Housing Act: "It does not require rural municipalities to encourage large scale housing developments. It does not require wasteful extension of roads and needless construction of sewer and water facilities for the out-migration of people from the cities and the suburbs." *Mount Laurel II*, 92 N.J. at 238-39, 456 A.2d 390. Rather, the Fair Housing Act is a civil rights statute intended to eradicate discriminatory

housing practices. It was not intended to be usurped by profit-maximizing developers to force municipalities to approve their residential development plans despite their conflict with a municipality's vision of the rate and character of its growth.[17] Nothing in the text or legislative history of the Fair Housing Act suggests that Congress intended to regulate and thereby subject to judicial review, a municipality's zoning ordinances which, *inter alia*, seek to provide for open space, to increase the commercial tax base, and to control residential growth in a non-discriminatory manner. *See Toll Bros., Inc. v. Mayor and Township Council of West Windsor*, No. MER-L-2343-98, slip op, at 48 (N.J.Super.Ct. Apr. 5, 1999)(adoption of a downzoning ordinance which reduced allowable residential density for certain districts does not violate the Fair Housing Act). Accordingly, Plaintiffs have failed to assert a cognizable claim under the Fair Housing Act.

### 3. *Plaintiffs cannot establish a Fair Housing Act claim*

██ Even if the Fair Housing Act applied, Plaintiff cannot establish a *prima facie* case of intentional discrimination. First, Plaintiffs have not presented credible evidence that the challenged land use ordinances, which are facially neutral, " 'bear[ ] more heavily on one [group] than another.' " *LeBlanc-Sternberg*, 67 F.3d at 425 (citing *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). Unlike the discriminatory zoning ordinances in *Parma*, which precluded construction of multi-family housing developments within the municipality and thereby adversely affected African-Americans, the challenged land use ordinances at issue, by decreasing the allowable housing

construction from 2161 units to 443 units, reduce housing choices available to all prospective residents in Eastampton regardless of familial status.

The historical background and the sequence of events leading to the adoption of the Master Plan Amendment further undercut Plaintiffs' claim of intentional discrimination. The motivating force behind the Master Plan re-examination process was the "public sentiment" for open space. This sentiment was reaffirmed by Eastampton residents' overwhelming approval of the open space municipal tax--the purpose for which was to preserve properties which are subject to residential development--in the November 1988 general election. The comprehensive land use amendments to the Township's Master Plan, which resulted from an intensive re-examination of the Township's development history and policies, sought to achieve various goals, including preserving open space, increasing the commercial tax base and controlling residential growth.

Defendants, concerned about the fiscal impact of uncontrolled residential growth on the local infrastructure, including schools, reduced the allowable residential construction and created new commercial/business zoning districts to increase the commercial tax base in Eastampton. In addition to preserving open space, Defendants were seeking to balance the tax burdens/benefits posed by these two types of developments. As a result of these comprehensive land use amendments, numerous properties located in Eastampton, including Plaintiffs' properties, were rezoned and/or downzoned. In adopting the challenged land use ordinances, the Planning

---

17. Significantly, ECLLC has filed at least three other lawsuits against Eastampton challenging the Township's plans for providing affordable housing within its borders. (Defs.' Br. at 3 n.1). This case is yet another instance where ECLLC is challenging Eastampton's land use policies because they conflict with its private interest.

Board and Council were responding to the public sentiment for open space and attempting to engage in sound land use planning.

Moreover, the essence of intentional discrimination under the Fair Housing Act is disparate treatment of a protected group based on an impermissible purpose. Plaintiffs have failed to present any evidence that Defendants have engaged in selective enforcement or targeted housing developments intended to be occupied by families with children in order to treat this group differently. *LeBlanc-Sternberg*, 67 F.3d at 431 (ample evidence that municipality's zoning ordinance would be interpreted to restrict the usage of home synagogues evidenced intentional discrimination against Orthodox and Hasidic Jews); *Audubon*, 797 F.Supp. at 360 (selective enforcement of zoning ordinances against a protected group evidenced intentional discrimination). ECLLC was seeking to construct 577 housing units on its property which was previously used as farmland, and Tabas was seeking to construct an unspecified number of housing units on its undeveloped, "environmentally sensitive land." Plaintiffs' residential development plans directly conflicted with the land use policies of preserving open space and controlling residential growth adopted by the Master Plan Amendment. Finally, Plaintiffs do not argue that Defendants departed from normal procedural or substantive requirements with respect to Defendants' denials of Plaintiffs' residential development applications. Accordingly, Plaintiffs cannot establish that the adoption of the challenged land use ordinances and the denials of their residential development applications were motivated by an intention to discriminate on the basis of familial status.

### V. *CONCLUSION*

Based on the reasons set forth above, it is on this 9th day of July, 2001, hereby ordered that the motion for partial summary judgment on count one filed by Plaintiffs is denied and the motion for partial summary judgment on count one filed by Defendants is granted.